IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

WILBER JOSE BENITES SOSA,
*Administrator of the Estate of*
*Wilber Heovany Garcia Benitez*,
      Plaintiff,

     v.                                   Civil No. 1:24cv499 (DJN)

GLENDELL HILL, *et al.*,
      Defendants.

**MEMORANDUM OPINION**

This matter comes before the Court on Motions to Dismiss Plaintiff Wilber Jose Benites

Sosa's ("Plaintiff") Second Amended Complaint[1] filed by Defendant Kimberly Finn (ECF No.

50), Defendants Douglas Sturm and Rappahannock Creative Health Center ("RCHC")

(collectively, "RCHC Defendants") (ECF No. 71), Defendants Tracy Allen, Daniels, Hendricks,

James, Lindsey, McDonald, Ralls, Thompson and Williams (collectively, "Correctional Officer

Defendants"[2]) (ECF No. 73), Defendants Meletis and Deshields (ECF No. 75), Defendants Amy

Allen, Archer, Azir, Coots, Crawford, Khan, Koko, Liagouris, Mobley, Ochieng, Revard and

Wright (collectively, "Medical Defendants") (ECF No. 77), and Defendants Prince William-

---

[1]     The Court notes that Plaintiff entitled his pleading "Amended Complaint" (ECF No. 34). However, given the existence of a previous Amended Complaint (originally filed in state court and subsequently removed to this Court), which was itself the subject of various motions to dismiss, the Court will instead refer to ECF No. 34 as Plaintiff's Second Amended Complaint.

[2]     While the Second Amended Complaint alleges that Defendant Lt. Gregory Deshields worked as a correctional officer at all times relevant to this complaint, Defendant Deshields filed a separate Motion to Dismiss from that of the remaining correctional officers in this suit.  (ECF No. 75.)  For the purposes of this Opinion, the Court therefore uses the term "Correctional Officer Defendants" to describe all correctional officers except Defendant Deshields.

Manassas Regional Adult Detention Center ("ADC"), Prince William-Manassas Regional Jail Board ("Jail Board") and Glendell Hill (collectively, "Jail Board Defendants") (ECF No. 79). The Court also considers two motions by Plaintiff seeking leave to file a sur-reply (ECF No. 98, 100).

As to Defendants' Motions to Dismiss, the Court will GRANT IN PART and DENY IN PART these motions. Because Plaintiff pleads standalone claims for wrongful death (Count Three) and survival actions (Count Eight) under Virginia Code §§ 8.01-50 *et seq.* and 8.01-25 *et seq.*, the Court will GRANT Defendants' motions as to these counts and DISMISS these counts entirely. The Court will DIRECT Plaintiff to replead Counts One and Two to conform with Virginia law.[3] As to the remaining counts, the Court will (a) GRANT Defendant Finn's Motion as to Count One and DENY her motion as to Counts Two and Seven; (b) GRANT Defendant RCHC's Motion as to Count Seven and DENY its Motion as to Counts One and Two; (c) GRANT Defendant Sturm's Motion as to Count Five and DENY his Motion as to Counts One, Two and Seven; (d) DENY Defendants Hendricks, James, Lindsey, McDonald, Ralls and Williams' Motion as to all remaining Counts; (e) GRANT Defendants Tracy Allen, Daniels and Thompson's Motion as to Count One and DENY their Motion as to Counts Two and Six; (f) GRANT Defendant Deshields' Motion as to Count Five and DENY his Motion as to Counts One, Two and Six; (g) GRANT Defendant Meletis' Motion as to all remaining counts; (h) GRANT Defendant Liagouris' Motion as to all remaining counts; (i) GRANT Defendants Koko and Ochieng's Motion as to Counts One and Five and DENY their Motion as to Counts Two and

---

[3]    On July 15, 2024, Plaintiff filed a Notice informing the Court that, should the Court grant any of the instant Motions to Dismiss, Plaintiff would request leave to amend the Second Amended Complaint. (ECF No. 97.) In light of Plaintiff's improper pleading of the wrongful death and survival actions in his Second Amended Complaint, the Court will DIRECT Plaintiff to amend his Second Amended Complaint as set forth below. *See infra* Section III.B.

Seven; (j) GRANT Defendant Archer's Motion as to Count Five and DENY her Motion as to Counts One, Two and Seven; (k) GRANT Defendants Amy Allen, Crawford, Mobley, Revard and Wright's Motion as to Count One and DENY their Motion as to Counts Two and Seven; (l) DENY Defendants Azir, Coots and Khan's Motion as to all remaining counts; and (m) GRANT Defendants ADC, Jail Board and Hill's Motion as to all remaining counts. The case shall proceed on all counts not otherwise dismissed by the Court.

Additionally, the Court will GRANT IN PART and DENY IN PART Plaintiff's motions seeking leave to file a sur-reply (ECF No. 98, 100). As to Plaintiff's motion concerning Jail Board Defendants (ECF No. 98), for the reasons set forth and to the extent described below, the Court will GRANT Plaintiff's motion and will DIRECT the Clerk to docket the proposed sur-reply (ECF No. 98-2). In light of Plaintiff's withdrawal of his argument concerning sovereign immunity, and as explained more fully below, the Court disregards that portion of Plaintiff's proposed sur-reply for the purposes of resolving Jail Board Defendants' Motion to Dismiss (ECF No. 79). As to Plaintiff's motion concerning Defendant Finn (ECF No. 100), the Court will GRANT Plaintiff's motion to file the proposed sur-reply to the limited extent that it seeks the Court's consideration of its responses to newly raised arguments and DENY Plaintiff's motion to convert Defendant Finn's Motion to Dismiss into a motion for summary judgment. The Court will also DIRECT the Clerk to docket the proposed sur-reply (ECF No. 100-2).

## I.    BACKGROUND

This negligence, gross negligence and § 1983 action[4] arises out of Defendants' alleged failure to provide Wilber Heovany Garcia Benitez ("Garcia") with adequate nourishment and

---

[4]    Plaintiff's Second Amended Complaint refers to Defendants' "willful and wanton negligence" on several occasions but raises formal claims only for ordinary negligence (Count One) and gross negligence (Count Two). *See, e.g.*, ECF No. 34 at 8 ("Plaintiff alleges

appropriate psychiatric and medical care during his period of detention at the Prince William-Manassas Regional Adult Detention Center ("ADC") from April 28, 2022 to May 22, 2022. Plaintiff, administrator of Mr. Garcia's estate, alleges that Garcia "suffered a prolonged, agonizing, and avoidable death" as a result of Defendants' failure to provide appropriate care. (ECF No. 34 ("2d Am. Compl.") at 8.)

### A.    Factual Background

At this stage, the Court must accept as true the facts set forth in the Second Amended Complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As such, the Court accepts the following facts for purposes of resolving the instant motions.

### 1.    The Defendants

ADC constitutes a regional jail operated by Defendant Prince William-Manassas Regional Jail Board ("Jail Board"), a regional jail authority created by Prince William County and the cities of Manassas and Manassas Park in Virginia. (*Id.* ¶ 7.) At all times relevant to Plaintiff's complaint, the Jail Board and Defendant Pete Meletis, ADC Superintendent, constituted the final policymakers with respect to ADC's operating policies and practices. (*Id.* ¶ 9.) Defendant Glendell Hill, Sheriff of Prince William County, served as the Chairman of the Jail Board during the relevant time period. (*Id.* ¶ 16.) The Jail Board appointed Defendant Meletis as ADC Superintendent, and he exercised control and authority over all ADC detainees in that capacity. (*Id.* ¶ 18.)

---

negligence, gross negligence, and willful and wanton negligence"). While Plaintiff references Defendants' alleged willful and wanton negligence in Count Three, the Court finds this Count improperly pled and will dismiss it from this action. *See infra* Section III.B. Given the absence of any other formal allegations of willful and wanton negligence in the Second Amended Complaint, the Court confines its analysis to ordinary and gross negligence.

Defendants Tracy Allen, Roosevelt Daniels, Lt. Gregory Deshields, Christopher Hendricks, Quinton James, Eric Lindsey, Jr., Brianna McDonald, Brennan Ralls, Anthony Thompson and Nicholas Williams served as correctional officers at ADC.  (*Id.* ¶ 19.) Defendants Daniels and Thompson performed intake evaluations, which included examining and processing new inmates and conducting mental health screenings.  (*Id.* ¶¶ 25–26.)  Defendant Tracy Allen was responsible for supervising all intake procedures at ADC.  (*Id.* ¶ 27.) Defendants Hendricks, James, Lindsey, McDonald, Ralls and Williams were responsible for conducting rounds in "C Pod," ADC's mental health unit, where Garcia was detained.  (*Id*. ¶¶ 28, 60.)  Defendant Deshields bore supervisory responsibility for all ADC correctional officers, including those in C Pod.  (*Id.* ¶ 29.)

Defendants Amy Allen, Katherine Archer, Ramzy Azir, Kaitlyn Coots, Dorothy Crawford, Kimberly Finn, Muhammed Khan, Kouadio Koko, Eleni Liagouris, Warleatha M. Mobley, Francisca Ochieng, Beverly Revard, Douglas Sturm and Vesha Wright served in various capacities as providers of health services at ADC.  (*Id.* ¶ 20.)  Defendant Sturm was Medical Director of the ADC and oversaw all healthcare for ADC inmates.  (*Id.* ¶ 31.) Defendant Archer served as Mental Health Supervisor, while Defendants Liagouris and Coots served as jail therapists.  (*Id.* ¶¶ 32–34.)  Defendant Koko served as ADC's Nursing Director, Defendant Ochieng served as Nurse Supervisor, and Defendants Amy Allen, Crawford, Finn, Mobley, Revard and Wright worked as nurses.  (*Id.* ¶¶ 35–36, 39.)  Defendants Azir and Khan conducted medical rounds and checks in the C Pod.  (*Id.* ¶¶ 37–38.)

Defendant Rappahannock Creative Health Care ("RCHC") served as a contractor to ADC and was responsible for providing all medical, mental health and psychiatric services to detainees at ADC during the relevant time period.  (*Id.* ¶ 21.)

### 2.    Plaintiff's Allegations Relating to Garcia's Medical Care at ADC

On April 28, 2022, Garcia was arrested and placed in pretrial detention at ADC.  (*Id.* ¶ 43.)  At the time of his arrest, Garcia weighed 165 pounds.  (*Id.* ¶ 44.)  Defendant Thompson was responsible for Garcia's intake examination and processing, during which Defendants Daniels and Allen were also present.  (*Id.* ¶¶ 47–49.)  On the day of his arrest, Garcia's family members contacted ADC and reported to corrections and medical staff, including to Defendant Archer, the Mental Health Supervisor, that Garcia suffered from serious mental health issues and provided detailed information regarding his mental health needs.  (*Id.* ¶¶ 50, 54.)  The intake officers were made aware that Garcia suffered from schizophrenia and had not taken his medications for an extended period before his arrest.  (*Id.* ¶ 51.)  Plaintiff asserts that, despite possessing this information, Defendants Allen, Daniels and Thompson failed to conduct a sufficient intake assessment that would have revealed Garcia's catatonic state and need for immediate medical attention.  (*Id.* ¶ 56.)  Instead, Defendant Thompson asked Garcia a series of standard intake questions.  (*Id.* ¶ 59.)  Garcia responded to all of these questions by shaking his head.  (*Id.*)  Thompson subsequently placed Garcia in C Pod, ADC's mental health unit.  (*Id.* ¶ 60.)

Plaintiff alleges that Garcia was specifically assigned to Pod 18C for further mental health review.  (*Id.* ¶ 61.)  Detainees in Pod 18C are kept separate from ADC's general population and must be checked on by staff at least twice per hour to ensure their safety. (*Id.* ¶¶ 62–63.)  ADC policy requires these cell checks to be recorded in a logbook at the cell block's main desk.  (*Id.* ¶ 64.)

On the day of Garcia's arrest, Defendant Archer contacted the Prince William Community Service ("PWCS") to verify whether Garcia had any prior recorded interactions or

hospitalizations with PWCS. (*Id.* ¶ 52.) PWCS confirmed to Archer that Garcia had been hospitalized less than a year ago for extreme paranoia. (*Id.*) Archer recorded this information, along with the information relayed by his family, in Garcia's medical log. (*Id.* ¶¶ 52–53.)

Given his mental illness, Garcia proved unable to communicate his condition and his healthcare needs to ADC staff throughout his period of detention. (*Id.* ¶ 58.) However, Garcia's family called ADC repeatedly between April 28, 2022, and May 22, 2022, reiterating that Garcia was severely mentally ill and that he needed to be transferred to a hospital. (*Id.* ¶ 55.)

A consequence of Garcia's mental illness was that he would stop eating and drinking during acute mental health episodes. (*Id.* ¶ 65.) Garcia's family informed Defendant Liagouris, a jail therapist, of this tendency. (*Id.* ¶ 73.) Despite ADC staff's awareness, Plaintiff asserts that, throughout the time of his detention at ADC, Garcia did not eat food and barely drank any fluids. (*Id.* ¶ 65.) As a result, Garcia became severely dehydrated and malnourished. (*Id.* ¶ 68.) Yet, despite Garcia's assignment to the jail's mental health unit, Plaintiff asserts that Garcia never underwent a mental health assessment and that nobody took any steps to address Garcia's inability to eat or drink. (*Id.* ¶ 61.)

Plaintiff further asserts that Garcia's malnutrition and dehydration were obvious and known to all of the Defendants who made security and medical rounds. (*Id.* ¶ 70.) At a point in Garcia's detention, Defendant Deshields ordered correctional officers to escort Garcia to the shower and to assist him in showering, since he had been unable to shower independently. (*Id.* ¶ 79.) Plaintiff alleges that Correctional Officer Defendants and Medical Defendants all knew that Garcia was either unable or unwilling to eat and drink independently. (*Id.* ¶ 66.) Yet, the officers neither took action to ensure that Garcia was eating or drinking, nor sought any other medical intervention during the first twelve days of his detention. (*Id.* ¶ 72.)

On May 10, 2022, twelve days before Garcia's death, unidentified correctional officers notified Defendant Coots, another jail therapist, that Garcia was not eating or drinking and was displaying "strange" behavior. (*Id.* ¶ 74.) Coots went to see Garcia and observed numerous trays of food lying on the floor. (*Id.*) That same day, Coots directed correctional officers to start a food log for Garcia to monitor his food intake. (*Id.* ¶ 75.) Coots also notified Defendants Archer (the Mental Health Supervisor) and Sturm (ADC's Medical Director) that Garcia had not eaten and that she had instructed the correctional officers concerning the food log. (*Id.*) Plaintiff asserts that Defendants Coots, Archer and Sturm took no additional action regarding Garcia, and that no food log was ever maintained. (*Id.* ¶¶ 75–77.)

Later that night, while cleaning and collecting trash from Garcia's cell, Defendant Hendricks noted that Garcia was grabbing his chest and appeared to be experiencing chest pain. (*Id.* ¶ 81.) Hendricks informed Defendant Mobley, a nurse, of Garcia's condition. (*Id.*) Approximately twelve minutes later, Mobley entered Garcia's cell and conducted a health assessment. (*Id.* ¶ 82.) Neither Hendricks nor Mobley took any action to transfer Garcia to the medical unit or a hospital at that time or at any point thereafter. (*Id.*)

On May 21, 2022, one day before Garcia's death, Defendant Khan performed a medical check on Garcia's cell block and was unable to elicit a verbal response from Garcia. (*Id.* ¶ 83.) Khan took no further action to procure additional care for Garcia. (*Id.*)

At around 10:30 a.m. on May 22, 2022, the day of Garcia's death, Defendant Khan performed another medical check on Garcia. (*Id.* ¶ 84.) Khan observed Garcia lying on his bed and moving his leg. (*Id.*) Khan again took no further action to procure additional care for Garcia. (*Id.*)

Approximately thirty minutes later, at 11:00 a.m., Defendant Williams conducted a security round of Garcia's cell block. (*Id.* ¶ 85.) Williams observed Garcia lying on the floor in a fetal position. (*Id.* ¶ 86.) Williams attempted to engage Garcia, to which Garcia responded with a grunt and a "thumbs up" gesture. (*Id.*) Williams took no further action with respect to Garcia. (*Id.*)

At 4:30 p.m., Defendant James conducted another security round of Garcia's cell block. (*Id.* ¶ 87.) James observed that Garcia had not eaten and asked Garcia if he intended to eat. (*Id.* ¶ 88.) Garcia nodded in response, and James took no further action. (*Id.* ¶¶ 88–89.)

Between 4:30 p.m. and 5:00 p.m.,[5] Defendant McDonald conducted a security round of Garcia's cell block and observed that Garcia had not eaten any food. (*Id.* ¶¶ 90–91.) McDonald asked Garcia if he was going to eat, and Garcia responded by grunting and nodding. (*Id.* ¶ 91.) McDonald took no further action. (*Id.*)

At 6:00 p.m., Defendant James conducted the next security round on Garcia's cell block, where he found Garcia laying on the floor of his cell, unresponsive. (*Id.* ¶ 92.) Noting Garcia's state, Defendant James requested that Defendant Williams open the door to the cell. (*Id.* ¶ 93.)

At 6:23 p.m., Officer Chaneyfield (not a defendant in this case) received a call from Defendant James to open Garcia's cell. (*Id.* ¶ 94.) James subsequently entered the cell and, recognizing that Garcia failed to display any signs of life, called a "Red Team" for an "unresponsive inmate." (*Id.* ¶ 95.) The Response Team arrived shortly thereafter, along with medical staff. (*Id.* ¶ 97.) James performed chest compressions on Garcia, noting that Garcia had no pulse and appeared to be stiff. (*Id.* ¶ 98.) James confirmed that Garcia had not eaten any of

---

[5]     The Second Amended Complaint reads "[a]t 4:30-5:00pm." (2d Am. Compl. ¶ 90.)

his food from that day.  (*Id.* ¶ 99.)  Garcia, who was naked and turning blue, was cold to the touch.  (*Id.* ¶ 100.)

A different medical team arrived approximately seven minutes later to relieve the ADC staff.  (*Id.* ¶ 101.)  The new team performed CPR and administered medical interventions until approximately 7:07 p.m., when Garcia was pronounced dead.  (*Id.*)  At the time of his death, Garcia weighed 136 pounds — nearly 30 pounds less than when he was arrested roughly four weeks earlier.  (*Id.* ¶¶ 68, 78.)

### B.    Procedural Background

On March 2, 2023, Plaintiff filed his original Complaint in the Circuit Court of Prince William County.  (ECF No. 1 at 1.)  He filed his First Amended Complaint in the same court on May 11, 2023.  (*Id.*)  On March 28, 2024, Defendants removed Plaintiff's action to this Court. (ECF No. 1.)  Medical Defendants subsequently filed an answer to the First Amended Complaint (ECF No. 10); the remaining Defendants filed motions to dismiss.  (ECF Nos. 3, 11, 13, 15, 23, 30.)

On April 25, 2024, Plaintiff filed his Second Amended Complaint.  (ECF No. 34.)  There, Plaintiff raises eight counts for relief based on the above allegations.  Counts One and Two assert negligence and gross negligence claims against all Defendants.  (*Id.* ¶¶ 103–17.)  Count Three asserts a claim of wrongful death under Virginia Code § 8.01-50, *et seq.*, against all Defendants, while Count Eight asserts, in the alternative, a survival action.  (*Id.* ¶¶ 118–25, 287–92.) Plaintiff also raises several claims alleging constitutional violations under § 1983.  Count Four asserts a *Monell* claim against Jail Board Defendants and Defendant Meletis for a policy or custom of deliberate indifference to serious medical needs.  (*Id.* ¶¶ 126–51.)  Count Five asserts a deliberate indifference claim based on supervisory liability against Defendants Archer,

10

DeShields, Hill, Koko, Meletis, Ochieng and Sturm.  (*Id.* ¶¶ 152–228.)  Finally, Counts Six and Seven assert claims of deliberate indifference to serious medical needs against Correctional Officer Defendants (Count Six) and Medical and RCHC Defendants (Count Seven).  (*Id.* ¶¶ 229–86.)  Based on the foregoing claims, Plaintiff seeks to hold Defendants jointly and severally liable for compensatory damages of ten million dollars plus interest, costs and attorney fees.  (*Id.* at 58).

Several groups of Defendants moved to strike the Second Amended Complaint as impermissibly filed without leave of court.  (ECF Nos. 36, 39, 40, 42.)  Plaintiff, in turn, sought to strike Defendant Finn's first Motion to Dismiss as untimely filed.  (ECF No. 44.)  United States Magistrate Judge William B. Porter denied these motions.  (ECF Nos. 64–65.)

Defendants subsequently filed the Motions to Dismiss currently before the Court.  (ECF Nos. 50, 71, 73, 75, 77, 79.)  Plaintiff timely responded, and Defendants replied, rendering these motions ripe for review.  (ECF Nos. 82, 84–86, 88, 90–96.)

Plaintiff subsequently filed a Consent Motion for Leave to file a Sur-Reply to Jail Board Defendants' Motion to Dismiss and attached his proposed sur-reply to that filing.  (ECF Nos. 98, 98-2.)  Plaintiff also filed a Motion for Leave to File a Sur-Reply to Defendant Finn's Motion to Dismiss and to Convert Finn's Motion to Dismiss to a Motion for Summary Judgment, again attaching his proposed sur-reply.  (ECF Nos. 100, 100-2.)  Defendants timely responded, and Plaintiff replied, rendering these motions ripe for resolution as well.  (ECF Nos. 102, 104–06.)

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding the facts, determine the merits of a claim or address potential defenses.  *Republican Party of N.C.*

*v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. The facts alleged must also be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

### III.    ANALYSIS

The Court begins by addressing Plaintiff's sur-reply motions before considering Defendants' objections to Counts Three and Eight as improperly pled. The Court then analyzes the viability of Plaintiff's remaining constitutional and negligence claims. Given the significant

variations among the factual allegations against the various Defendants, the Court will organize its analysis by Defendant group, rather than by count.

### A.    Outstanding Motions for Leave to File Sur-Reply

Before addressing Defendants' motions to dismiss, the Court must first resolve which briefs to include in its review.  To that end, the Court considers Plaintiff's two outstanding motions seeking leave to file a sur-reply.  (ECF Nos. 98, 100.)  The Court will GRANT Plaintiff's motions to the extent set forth below.

Plaintiff styles his first sur-reply motion (ECF No. 98) as a consent motion and seeks leave to file a sur-reply to Jail Board Defendants' Motion to Dismiss.  (ECF No. 79.)  Plaintiff asserts that Jail Board Defendants raised new arguments in their reply brief, rendering a sur-reply necessary to address these arguments.  (ECF No. 99 at 1–4.)  Plaintiff's proposed sur-reply addresses (1) whether ADC has the capacity to be sued and (2) whether Eleventh Amendment immunity applies to Jail Board Defendants.[6]  (ECF No. 98-2 at 1–11.)  In response to Plaintiff's motion, Jail Board Defendants assert that they consented only to a sur-reply with respect to the Eleventh Amendment issue.  (ECF No. 105 at 1–2.)  As to Plaintiff's arguments concerning ADC's capacity to be sued, Jail Board Defendants dispute that their reply brief raised new issues justifying a sur-reply.  (*Id.*)

This Court "highly disfavor[s]" the filing of sur-replies, as they usually constitute "a strategic effort by the nonmoving party to have the last word on the matter."  *Trs. of Colum. Univ. in N.Y. v. Symantec Corp.*, 2019 WL 13189619, at *2 (E.D. Va. Oct. 10, 2019).  Nonetheless, after reviewing the briefing, the Court finds that consideration of Plaintiff's sur-

---

[6]    Plaintiff subsequently withdrew the section of his proposed sur-reply concerning state sovereign immunity arguments.  (ECF No. 106 at 2.)

reply will serve the interests of justice by assisting the Court's resolution of the issues raised in Jail Board Defendant's reply brief.  The Court will therefore GRANT Plaintiff's Motion (ECF No. 98) with respect to Eleventh Amendment immunity and ADC's capacity to be sued.  *See Symantec*, 2019 WL 13189619, at *2 (accepting sur-reply where it "would assist the Court in considering the issues" and where there were "new arguments" raised or expanded on in the reply brief).  The Court will not consider Plaintiff's withdrawn arguments on state sovereign immunity.

Plaintiff's second sur-reply motion seeks leave to file a sur-reply regarding Defendant Finn's Motion to Dismiss and asks the Court to convert Finn's Motion into a motion for summary judgment.  (ECF No. 100.)  Plaintiff's proposed sur-reply argues that Finn's reply brief raised new and incorrect arguments concerning Plaintiff's prior access to medical records before it devolves into accusations concerning prior rounds of discovery in state court.  (ECF No. 100-2 at 1–4.)  For the same reasons as Plaintiff's first motion, the Court will GRANT this motion to the limited extent that it seeks the Court's consideration of its responses to newly raised arguments.  Further, the Court will DENY Plaintiff's motion to convert Defendant Finn's Motion to Dismiss into a motion for summary judgment.  Plaintiff bases his request on the fact that Finn's Motion alleges that Plaintiff received Garcia's medical records through judicially noticeable records requests and subpoenas.  (ECF No. 101 at 3–5.)  Such allegations do not require conversion of Finn's Motion into a motion for summary judgment. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) (recognizing that district courts may consider facts subject to judicial notice without converting a motion to dismiss into a motion for summary judgment).  In addition, the Court will not consider Plaintiff's arguments in his sur-

reply concerning Finn's compliance with state court discovery obligations, which are irrelevant to resolving the instant Motions.  (*Id*. at 3–4.)

### B.    Wrongful Death/Survival Action

The Court next considers objections raised by several Defendants concerning Count Three (Plaintiff's claim of "Wrongful Death" under Virginia Code § 8.01-50, *et seq.*) and Count Eight (Plaintiff's claim for a "Survival Action"), which apply to all Defendants in this action. Defendants raise two overlapping objections, arguing that (1) Plaintiff improperly seeks to bring simultaneous wrongful death and survival actions for the same set of events where Virginia's wrongful death statute provides the exclusive method of recovery in such cases, and (2) Plaintiff improperly pleads freestanding claims for wrongful death and survival actions where neither statutory provision provides an independent cause of action, with each merely granting a "right of action" for a tort claim.  (ECF No. 51 at 4–5 (citing *Miller v. United States*, 932 F.2d 301, 303 (4th Cir. 1991)); ECF No. 74 at 10–14[7]; ECF No. 76 at 6–7.)  These claims generally concern the intersection between Virginia Code § 8.01-25, which provides that claims survive the death of the person "in whose favor the cause of action existed," Virginia Code § 8.01-50, which governs claims for the wrongful death of a decedent, and common law causes of action for negligence and gross negligence.

As to Defendants' first objection, the Court finds that Plaintiff may properly plead a claim under the wrongful death statute while pleading, in the alternative, a survival action claim concerning the same underlying conduct.  Under Virginia Code § 8.01-50 *et seq.*, a party may bring a wrongful death suit "[w]henever the death of a person shall be caused by the wrongful

---

[7]    Defense counsel for Correctional Officer Defendants opted to use non-numerical characters instead of page numbers for their Memorandum in Support (ECF No. 74).  The Court will therefore refer to the CM/ECF-imposed pagination for this filing.

act [or] neglect . . . ." Va. Code § 8.01-50. A survival action, by contrast, accrues during an individual's lifetime and may be brought posthumously where that individual dies in the interim of intervening causes. *See Centra Health, Inc. v. Mullins*, 670 S.E.2d 708, 714–15 (Va. 2009) (discussing the interaction between wrongful death and survival actions). The Supreme Court of Virginia has emphasized that plaintiffs may obtain only one recovery for the same injury, and that, if "injuries cause death, the recovery must be sought under Code § 8.01-50, the wrongful death statute." *Lucas v. HCMF Corp.*, 384 S.E.2d 92, 94 (Va. 1989). However, where "causation was in doubt," plaintiffs remain free to plead both types of actions. *Centra Health*, 670 S.E.2d at 717. While Plaintiffs must ultimately elect one remedy, the proper time for such an election is "when the record sufficiently establishes that the personal injuries and the death arose from the same cause." *Id.* at 718. Accordingly, in *Centra Health*, the Supreme Court of Virginia held that a plaintiff could permissibly present both types of actions to a jury where the jury could discount evidence that a urinary infection led to the decedent's death while crediting evidence that it led to other injuries. *Id.* at 719.

Like the plaintiff in *Centra Health*, Plaintiff here has alleged that Defendants' actions caused Garcia's death and, in the event that such causation is not established, that Defendants caused injuries, pain and suffering to Garcia short of death. (2d Am. Compl. ¶¶ 118–25, 287–92.) Therefore, as in *Centra Health*, while Plaintiff cannot ultimately recover under both theories, he may pursue these alternative theories at this stage.[8] *See also Byers v. City of*

---

[8] Unlike the cases cited by Defendants, Plaintiff here did not incorporate the allegation that Defendants caused Garcia's death into his survival action claim. *Compare Smith v. Town of South Hall*, 611 F. Supp. 3d 148, 192 (E.D. Va. 2020) (noting that Smith incorporated "each and every allegation" of the complaint into the survivorship claim, including allegations that the decedent died as a result of the tortious conduct), *with* 2d. Am. Compl. ¶ 287 (expressly not incorporating prior allegations regarding the tortious conduct purportedly causing Garcia's death).

*Richmond*, 2024 WL 4295232, at *11 (E.D. Va. Sept. 25, 2024) ("Plaintiffs seek to alternatively plead survival and wrongful death causes of action.  Virginia law plainly permits them to do so.").  Defendants' motions to dismiss Counts Three or Eight on these grounds will therefore be denied.

As to Defendants' second objection, which Plaintiff failed to address, the Court agrees with Defendants that Counts Three (Wrongful Death) and Eight (Survivor Action) are improperly pled.  Consequently, and for the reasons set forth below, the Court will dismiss Counts Three and Eight as to all Defendants and direct Plaintiff to replead his negligence and gross negligence claims to accurately reflect the theory of recovery that he seeks to assert.

The Fourth Circuit and Virginia courts have repeatedly noted that Virginia's wrongful death statute, Virginia Code § 8.01-50 *et seq.*, does not create a separate cause of action, but provides only a "right of action in a personal representative to enforce the decedent's claim for any personal injury that caused death."  *Miller*, 932 F.3d at 303; *see also Culler v. Johnson*, 98 Va. Cir. 470, 479 (Va. Cir. Ct. 2014) ("[I]n Virginia, a wrongful death action is derivative of and is dependent on an injury claim"); *Harmon v. Birdmont Health Care*, 98 Va. Cir. 433, 436 (Va. Cir. Ct. 2013) ("The language of Virginia's Wrongful Death Statute indicates that wrongful death actions have a derivative nature.").  The same principle governs survival claims under § 8.01-25, which expressly references "cause[s] of action whether legal or equitable" and merely sets forth that such causes of action "shall survive . . . the death of the person in whose favor the cause of action existed."  Va. Code § 8.01-25.  As Defendants correctly note, Plaintiff's complaint contradicts these principles, containing both negligence and gross negligence claims (Counts One and Two), as well as claims entitled "Wrongful Death" (Count Three) and "Survival Action" (Count Eight).  (2d Am. Compl. at 29, 57.)  As such, Plaintiff effectively

attempts to plead his negligence and gross negligence claims twice, which Virginia law does not permit.

In light of the case law and statutory text cited above, the Court finds that Plaintiff's freestanding wrongful death and survivorship claims are inappropriately pled. Consequently, the Court will dismiss Counts Three and Eight as to all Defendants. The Court further directs Plaintiff to replead his negligence and gross negligence claims to accurately reflect the theory of recovery that he seeks to assert.[9]

### C.    Defendants' Motions to Dismiss – Legal Standards

The Court proceeds to analyze Plaintiff's specific claims against the various Defendants. Since all Counts apply to multiple Defendants, the Court begins by setting forth the legal requirements for claims under each count before considering the validity of Plaintiff's claims against each Defendant or Defendant group.

### 1.    Deliberate Indifference under § 1983 (Counts Six and Seven)

Pretrial detainees may not be "subject to any form of 'punishment.'" *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021). Consequently, any claims raised by pretrial detainees, or on their behalf, stand premised on the Fifth or Fourteenth Amendment Due Process Clause, rather than the Eighth Amendment's prohibition on cruel and unusual punishment. *Id.* Where a

---

[9]    The court reiterates that, under *Centra Health*, Plaintiff may plead his negligence and gross negligence claims under both a wrongful death and a survival theory at this stage of the litigation. *Centra Health*, 670 S.E.2d at 717. However, if Plaintiff wishes to assert claims under both theories, he must continue to plead them separately. *See, e.g.*, *Adams v. NaphCare, Inc.*, 2016 WL 10455885, at *5 (E.D. Va. Dec. 19, 2016) (indicating that survival and wrongful death claims should be pled in "separate counts" to "clearly reflect[] alternative pleading"); *Byers*, 2024 WL 4295232, at *11 (recognizing that "at the very least, a plaintiff must include separate counts *or* allegations in order to advise the court and opposing counsel of their intention to plead both survival and wrongful death actions").

pretrial detainee raises a constitutional claim of denial of medical care, such plaintiff makes out a violation "at least" to the extent that he meets the Eighth Amendment standard for deliberate indifference to serious medical needs. *Id.*

The Fourth Circuit recently revised its approach to constitutional claims of deliberate indifference to a medical need of a pretrial detainee in *Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023). Under this framework, pretrial detainees must plead four elements to state such a claim: (1) the detainee had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed. *Id.* at 611. Critically, under *Short*, plaintiffs no longer need to show that the defendant possessed actual knowledge of the detainee's serious medical condition, but only that the defendant's action or inaction proved "objectively unreasonable." *See id.* (explaining that, while a showing of actual knowledge and conscious disregard of the risk that action or inaction would result in harm "remains sufficient," it is "no longer necessary"). To constitute a medical condition sufficient to satisfy *Short*'s first prong, the medical condition must be one "that has either been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Lapp v. United States*, 706 F. Supp. 3d 568, 577 (E.D. Va. 2023) (quoting *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016)).

A plaintiff who raises a claim of deliberate indifference to a medical need against non-medical prison officials must make additional showings. *Keeton v. Dudley*, 2024 WL 4495491, at *4 (E.D. Va. Oct. 15, 2024) (citing *Dallas v. Craft*, 2022 WL 2079312, at *11 (E.D. Va. June

9, 2022)).  In such cases, plaintiffs must also establish that defendants:  (1) "failed promptly to provide an inmate with needed medical care," (2) "deliberately interfered with the prison doctors' performance," or (3) "tacitly authorized or were indifferent to the prison physicians' constitutional violations."  *Craft*, 2022 WL 2079312 at *11 (quoting *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990)).

Failure by a prison official to respond to an inmate's known medical needs "raises an inference of deliberate indifference."  *Scinto*, 841 F.3d at 225.

### 2.    Supervisory Liability under § 1983 (Count Five)

Liability under § 1983 cannot be predicated on a theory of *respondeat superior*.  *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).  Rather, supervisors "are liable in their individual capacities only for their personal wrongdoing or supervisory actions that violated constitutional norms."  *Clark v. Md. Dep't of Pub. Safety & Corr. Servs.*, 316 F. App'x 279, 282 (4th Cir. 2009).  Thus, a claim for supervisory liability under § 1983 requires a plaintiff to plausibly allege three elements:  (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury; (2) the supervisor's response was so inadequate as to show deliberate indifference or tacit authorization; and (3) there was an affirmative causal link.  *Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (citing *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

To satisfy the first element, a plaintiff must show that the conduct "poses a pervasive and unreasonable risk," meaning that "the conduct is widespread, or at least has been used on several different occasions."  *Shaw*, 13 F.3d at 799.  Under the second element, a plaintiff must again establish that the supervisor failed to act "in the face of documented widespread abuses."  *Id*.

20

The third element requires the plaintiff to demonstrate an "affirmative causal link," encompassing cause in fact and proximate cause, between the supervisor's inaction and the harm suffered by the plaintiff. *Id.* In the context of a case concerning disregard of a detainee's medical needs, to satisfy *Shaw's* test, a plaintiff must plausibly allege that defendants "knew, or should have known, that their subordinates routinely ignored the medical needs of inmates, and that the supervisors' subsequent response to these offenses — if any — proved glaringly insufficient." *Craft*, 2022 WL 2079312 at *22.

### 3.    Municipal Liability under § 1983 (*Monell* Claims) (Count Four)

Plaintiffs may assert claims against local government entities under § 1983 for the unconstitutional actions of their employees where these harms are directly attributable to the entity. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Such *Monell* claims may be brought against government entities directly or against government officers acting in their official capacity; in the latter scenario, such actions are treated as actions against the public employer. *Robinson v. City of Richmond Police Dep't*, 2023 WL 6931327, at *3 (E.D. Va. Oct. 19, 2023) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)).

Municipal liability attaches only where the municipality harms the plaintiff "through an official policy or custom."[10] *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (citing *Monell*, 436 U.S. at 690–91)). A plaintiff may establish a municipal policy or custom by looking to: (1) express ordinances and regulations; (2) affirmative decisions of final policy makers; (3) omissions by final policy makers that "manifest deliberate indifference to the rights of citizens," or (4) practices that are so "persistent and widespread" and "so permanent and well

---

[10]    Municipalities cannot be held vicariously liable under § 1983 on a theory of *respondeat superior*. *Monell*, 436 U.S. at 691.

settled as to constitute a 'custom or usage' with the force of law." *Id.* at 218 (internal citations omitted). Under option four, courts will not infer such a policy or custom merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees. *Milligan v. City of Newport News*, 743 F.2d 227, 230 (4th Cir. 1984). Nor will "isolated incidents of unconstitutional conduct" establish such a custom or practice; rather, "numerous particular instances" of unconstitutional conduct are required. *Lytle v. Doyle*, 326 F.3d 463, 473 (4th Cir. 2003); *see also Robinson v. Baltimore Cnty.*, 2022 WL 3577267, at *6 (D. Md. Aug. 19, 2022) (recognizing that "a complaint must allege more than one instance of previous illegal conduct" to plausibly allege a claim based on custom or usage).

*Monell* liability may also be established under a condonation or ratification theory, wherein plaintiffs must show that the government entity failed to correct or stop (and thereby condoned) a "widespread pattern of unconstitutional conduct." *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014). The Fourth Circuit has noted that prevailing under a condonation theory "is no easy task" and requires showing a "persistent and widespread practice" of sufficient "duration and frequency" to indicate that policymakers (1) had either actual or constructive notice of unconstitutional conduct by their officers and (2) failed to correct it due to "deliberate indifference." *Id*. at 402.

Finally, *Monell* liability can be based on a municipality's failure to train its officers where such failure reflects a deliberate or conscious choice not to train, amounting to "deliberate indifference to the rights of its citizens." *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000). To prevail on a failure-to-train claim, plaintiffs must allege (1) facts revealing the nature of the training, (2) that the training (or lack thereof) was a deliberate choice and (3) that the employee conduct at issue resulted from the training (or lack thereof). *Id*. A plaintiff sufficiently alleges a

failure-to-train claim if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). To make such a showing, plaintiffs ordinarily must establish "[a] pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

### 4.    Negligence and Gross Negligence (Counts One and Two)

To plead a claim for negligence under Virginia law, a plaintiff must allege (1) the existence of a legal duty, (2) a breach of that duty, (3) proximate causation and (4) damages to the plaintiff. *Atrium Unit Owners Ass'n v. King*, 585 S.E.2d 545, 548 (Va. 2003). Ordinary negligence "involves the failure to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another." *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918 (Va. 2004). Gross negligence, by contrast, constitutes "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016) (quoting *Cowan*, 603 S.E.2d at 918). It requires "a degree of negligence that would shock fair-minded persons." *Doe v. Baker*, 857 S.E.2d 573, 587 (Va. 2021). The standard is one of "indifference, not inadequacy." *Fijalkowski v. Wheeler*, 801 F. App'x 906, 914 (4th Cir. 2020) (citing *Elliott*, 791 S.E.2d at 732). Thus, claims for gross negligence "must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Id.*

District courts in the Fourth Circuit have repeatedly held that, where plaintiffs state a claim for deliberate indifference under § 1983, they likewise state a claim for gross negligence under Virginia law. *See, e.g.*, *Rucker v. Piedmont Reg'l Jail Auth.*, 2021 WL 3863346, at *8

(E.D. Va. Aug. 30, 2021) ("Because the Court has already determined that Plaintiff has stated a claim for deliberate indifference, the Court concludes that he has likewise stated a claim for gross negligence against these Defendants."); *Hixson v. Hutcheson*, 2018 WL 814059, at *6 (W.D. Va. Feb. 9, 2018) ("[A] claim for gross negligence under Virginia law requires a lesser showing of recklessness than a claim for deliberate indifference under the Eighth and Fourteenth Amendments.").  These conclusions were based on the Fourth Circuit's standard for deliberate indifference claims, which required plaintiffs to show that "the defendant subjectively knew of a substantial risk," whereas gross negligence only requires a showing that the defendant "should have known the substantial risk existed." *Boley v. Armor Corr. Health Servs., Inc.*, 2022 WL 905219, at *10 (E.D. Va. Mar. 28, 2022).  As previously discussed, the Fourth Circuit recently changed the framework for deliberate indifference claims, eliminating this subjective factor and replacing it with an objective test similar to the one for gross negligence. *See Short*, 87 F.4th at 611 ("The plaintiff no longer has to show that the defendant had actual knowledge" of a detainee's serious medical condition and "consciously disregarded the risk" that their action or inaction would lead to harm, but instead "must show that the defendant should have known of that condition and that risk.")  Since the *Short* standard for deliberate indifference remains at least as demanding as the gross negligence standard, this Court finds that a valid claim for deliberate indifference continues to state a valid claim for gross negligence.

Further, where a plaintiff states a claim for gross negligence, such claim necessarily encompasses a claim for ordinary negligence under Virginia law. *See Rucker*, 2021 WL 3863346 at *8 ("[B]ecause simple negligence constitutes a lower degree of negligence than gross negligence, [and] because Plaintiff has adequately alleged a gross negligence claim, Plaintiff has also necessarily stated a claim for simple negligence." (citing *Cowan*, 603 S.E.2d at 918)).

Under the doctrine of *respondeat superior*, plaintiffs may recover damages from an employer for the tortious acts of an employee "if the employee was performing his employer's business and acting within the scope of his employment." *Kensington Assocs. v. West*, 362 S.E.2d 900, 901 (Va. 1987). Employers can face such liability in actions for both negligence and gross negligence. *See, e.g.*, *Craft*, 2022 WL 2079312 at *27 (finding that plaintiff successfully stated a claim for gross negligence against employer under a *respondeat superior* theory).

### 5.    Sovereign Immunity and Qualified Immunity

In Virginia, the doctrine of sovereign immunity acts as a "bar to the plaintiff's right of recovery" for state law tort claims against the Commonwealth. *Sams v. Armor Corr. Health Servs.*, 2020 WL 5835310, at *13 (E.D. Va. Sept. 30, 2020). "Because government can function only through its servants, certain of those servants must enjoy the same immunity in the performance of their discretionary duties as the government enjoys." *Pike v. Hagaman*, 787 S.E.2d 89, 92 (Va. 2016) (cleaned up). The Supreme Court of Virginia has set out a four-factor test to assess whether sovereign immunity applies. *Messina v. Burden*, 321 S.E.2d 657, 663 (Va. 1984). Courts must consider: (1) the nature of the function that the employee was performing; (2) the extent of the state's interest and involvement in that function; (3) whether the act performed by the employee involved the use of judgment and discretion; and (4) the state's degree of control and direction over the employee. *Id.* Specific to prong three, individuals working for an immune government entity may invoke sovereign immunity only if their challenged conduct "consisted of acts of judgment and discretion which are necessary to the performance of essential governmental functions." *Craft*, 2022 WL 2079312 at *28 (citing *Heider v. Clemons*, 400 S.E.2d 190, 191 (Va. 1991)). Sovereign immunity bars claims of simple negligence but "is not available to a defendant whose culpability extends beyond mere

25

negligence." *McLenagan v. Karnes*, 27 F.3d 1002, 1008 n.10 (4th Cir. 1994); *accord James v. Jane*, 282 S.E.2d 864, 869 (Va. 1980) ("A state employee who acts wantonly, or in a culpable or grossly negligent manner, is not protected."). Thus, to the extent that sovereign immunity applies to any of Plaintiff's claims in this case, it would shield Defendants from liability only under Count One.

Qualified immunity protects government officials performing discretionary functions from civil liability where "their conduct does not violate clearly established or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has established a two-step inquiry in which courts must determine: (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts may perform that inquiry in either order. *Id*. at 236.

### D.    Defendants' Motions to Dismiss – Analysis

#### 1.    Finn's Motion to Dismiss

Defendant Finn, a nurse, seeks to dismiss each of the claims against her based on Plaintiff's purported failure to set forth adequate facts. (ECF No. 51 at 4–9.) Given the Court's earlier finding concerning Counts Three and Eight, the remaining claims against Finn include claims for negligence (Count One), gross negligence (Count Two), and deliberate indifference under § 1983 (Count Seven).

The Court must first address a pleading issue that affects Defendant Finn and many other Defendants. Despite raising claims against Finn under Counts One, Two and Seven, certain key factual allegations concerning Defendant Finn and other Medical Defendants appear only in

Count Seven of the Second Amended Complaint.  (2d Am. Compl. ¶¶ 256, 270–72.)  These allegations are as follows:  (1) Defendant Finn was a nurse at ADC; (2) she was aware that Garcia had a mental illness based on his placement in the C Pod Mental Health Unit; (3) she saw Garcia on a daily basis between April 28, 2022 and May 22, 2022; and (4) she ignored Garcia's deteriorating physical state and failed to elevate his care to a higher level.  (*Id*.)  Count Two contains a paragraph expressly "incorporat[ing] by reference each preceding *and succeeding* paragraph."  (*Id.* ¶ 110 (emphasis added).)  Thus, the factual allegations cited above are also properly incorporated as to Count Two, even though they are stated later in the complaint under Count Seven.  By contrast, Count One contains language incorporating the preceding, but not succeeding, paragraphs.  (*Id*. ¶ 103.)  The factual allegations contained in Count Seven are therefore not properly incorporated as to Count One.

    For the reasons set forth below, the Court finds that Plaintiff alleged sufficient facts against Defendant Finn in paragraphs 256 and 270–72 to state a claim with respect to Counts Two (gross negligence) and Seven (§ 1983 claim).  However, since Plaintiff failed to incorporate these factual allegations as to Count One, and since the remaining factual allegations prove insufficient, the Court finds that Plaintiff's Count One fails to state a claim for ordinary negligence against Defendant Finn.  The Court will therefore dismiss Count one as to Defendant Finn without prejudice.

    As to Count Seven, Plaintiff's allegations of deliberate indifference prove sufficient to survive Defendant Finn's Motion to Dismiss, because they allege that Defendant Finn — who possesses medical training and saw Garcia daily during his period of detention — ignored Garcia's physical condition and weight loss until Garcia died from malnutrition and dehydration.  The Second Amended Complaint sufficiently establishes that Garcia's mental health issues and

his resulting malnutrition and dehydration constituted "medical condition[s]. . . that posed a substantial risk of serious harm" and that, as a result of Finn's alleged inaction, Garcia "was harmed." *Short*, 87 F.4th at 611; (2d. Am. Compl. ¶¶ 50–52, 55, 58, 67–69, 86, 91, 95, 98, 102.) In addition, Plaintiff specifically alleges that Defendant Finn saw Garcia daily from his first day at ADC until his last day and took no action despite his declining condition.  (2d Am. Compl. ¶¶ 256, 270–72.)  These allegations establish with sufficient specificity that Defendant Finn "recklessly . . . failed to act to appropriately address the risk" posed by Garcia's malnutrition and dehydration, and that she "should have known" that he was suffering from malnutrition and dehydration and that her nonaction in the face of his deterioration "posed an unjustifiably high risk of harm." *Short*, 87 F.4th at 611.[11]  As such, Plaintiff sets forth sufficient facts to satisfy all four requirements for a § 1983 claim of deliberate indifference to a medical need.

Defendant Finn does not substantively engage with the allegation that she interacted with Garcia daily, observed his deterioration and took no action.  Rather, Finn argues that courts within the Fourth Circuit have interpreted *Twombly* and *Iqbal* to "mean that generic or general allegations about the conduct of 'defendants' without more, fail to state a claim."  (ECF No. 51 at 3 (citing *Reid v. Clarke*, 2018 WL 2470740, at *5–6 (W.D. Va. 2018).)  The Court disagrees

---

[11]    The caselaw stands replete with examples where similar allegations suffice to state a claim of deliberate indifference.  *See, e.g.*, *Freeman v. Berge*, 441 F.3d 543, 546 (7th Cir. 2006) (recognizing that a prison cannot "allow a prisoner to starve himself to death or even starve himself to the point at which he seriously impairs his health"); *Sanville v. McCaughtry*, 266 F.3d 724, 738 (7th Cir. 2001) (finding that plaintiff stated a deliberate indifference claim against correctional officers where the decedent was "not a normally functioning individual" and "put jail officials on notice that there was a significant likelihood that he would attempt to harm himself"); *McBride v. Houston Cnty. Health Care Auth.*, 658 F. App'x 991, 998–99 (11th Cir. 2016) (finding that plaintiff stated a claim against correctional officer who knew that the plaintiff "was unable to eat or drink"); *Carswell v. Bay Cnty.*, 854 F.2d 454, 458 (11th Cir. 1998) (holding that failure to provide medical care for inmate who suffered, among other things, significant weight loss constituted deliberate indifference).

with Finn's characterization of Plaintiff's Second Amended Complaint, which sets forth Finn's conduct — in particular, her regular observation of Garcia and her inaction in the face of his deteriorating condition — with sufficient particularity to state a valid claim.

Defendant Finn also raises a qualified immunity defense to Plaintiff's constitutional claim. (ECF No. 51 at 10.) Finn's argument falls flat in the face of longstanding recognition that prisoners have a right to the provision of adequate food and medical attention and that displaying deliberate indifference to prisoners' serious medical needs violates their civil rights. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing provision of "adequate food" as among prison officials' duties); *Reed v. McBride*, 178 F.3d 849, 852–54 (7th Cir. 1999) (alleged deprivation of food states Eighth Amendment claim depending on amount and duration of deprivation); *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992) (describing right of pretrial detainees to medical attention as "clearly established").[12] Given the allegations that Defendant Finn knew of Garcia's mental health issues (in light of his placement in the C Pod) and observed,

---

[12]    *See also Cherrington v. Skeeter*, 344 F.3d 631, 637 (6th Cir. 2003) (holding that when a government entity "fails to provide for [a prisoner's] basic human needs — *e.g.* food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment"); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (noting that a "prison inmate has [an] Eighth Amendment right [to] be free from deliberate indifference to psychiatric needs"); *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990) (noting that "every reported decision handed down after *Estelle* [*v. Gamble*, 429 U.S. 97 (1976),] and before [June 1985] . . . recognized that deliberate indifference to an inmate's need for mental health care is actionable on [E]ighth [A]mendment grounds"); *Woodall v. Foti*, 648 F.2d 268, 270 (5th Cir. 1981) (holding that an allegation that prisoner "had been denied medically necessary psychiatric care" stated a claim under the Eighth Amendment); *Inmates of the Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979) (holding that "when inmates with serious mental ills are effectively prevented from being diagnosed and treated . . . the system of care does not meet the constitutional requirements set forth by *Estelle*"); *Duffey v. Bryant*, 950 F. Supp. 1168, 1177 (M.D. Ga. 1997) (denying qualified immunity where defendants observed that inmate was not eating and appeared in psychological distress and did nothing).

on a daily basis, his physical deterioration as he failed to eat or drink, and given the allegations that Garcia's condition went untreated and resulted in his untimely death, the Court finds that, as pled, Defendant Finn's actions violated a clearly established right and that Garcia's rights were, in fact, violated in this regard.  As a result, qualified immunity cannot shield Defendant Finn from liability at this time.

As to gross negligence, the Court finds that Plaintiff plausibly states a claim against Defendant Finn in light of its earlier finding that a valid claim for deliberate indifference necessarily supports a claim for gross negligence under Fourth Circuit and Virginia law.  *See supra* Section III.C.4.  However, Plaintiff's failure to properly incorporate the factual allegations listed under Count Seven into his ordinary negligence claim under Count One proves fatal to this claim.  Plaintiff's remaining allegations state that Defendant Finn worked as a nurse at ADC, (2d Am. Compl. ¶ 39), but fail to specify that she worked on Garcia's unit or had any direct interactions with him.  While Plaintiff alleges that Finn (as part of the larger group of "Medical Defendants") "had notice of and knew that Mr. Garcia was unable or unwilling to eat food and drink fluids independently," (*id.* ¶¶ 66), that allegation on its own is too unspecific to establish that she acted unreasonably with regard to Garcia and his needs.  Since the facts incorporated into Count One do not plausibly establish, as Defendant Finn states, that she "was even aware of anything on any date or time regarding what is alleged to have caused [Garcia's] death," (ECF No. 51 at 6–7), the Court will grant Defendant Finn's Motion as to Plaintiff's negligence claim.[13]

\*        \*        \*

---

[13]     Given the Court's dismissal of Count One as to Defendant Finn, the Court need not evaluate Finn's sovereign immunity defense, which she presents only with regard to Count One.

In sum, the Court finds that Plaintiff states claims of gross negligence and deliberate indifference against Defendant Finn under Counts Two and Seven.  Further, the Court finds that Finn cannot establish an entitlement to qualified immunity.  However, Plaintiff fails to state a claim of negligence against Defendant Finn.  As a result, that claim will be dismissed.

### 2.        The RCHC Motion to Dismiss

Defendant Sturm, ADC's Medical Director, and Defendant RCHC seek to dismiss all claims against them.  (ECF No. 71.)  Given the Court's earlier finding concerning Counts Three and Eight, the remaining claims against Sturm and RCHC include negligence (Count One), gross negligence (Count Two), deliberate indifference to serious medical needs under § 1983 (Count Seven) and supervisory liability under § 1983 (Count Five as to Sturm only).  Defendants present several arguments for dismissal; the Court will address each argument below.

For the reasons set forth below, the Court finds that the facts alleged against Defendant Sturm prove sufficient to state a claim with respect to Counts One (negligence), Two (gross negligence) and Seven (deliberate indifference under § 1983).  Plaintiff fails to state a claim against Sturm as to Count Five (supervisory liability).   As to Defendant RCHC, the Court finds that Plaintiff states a valid claim for liability under Counts One (negligence) and Two (gross negligence), but fails to state a claim under Count Seven (deliberate indifference).

### a.        Rule 8

The Court begins by addressing RCHC Defendants' argument concerning Federal Rule of Civil Procedure 8, which mandates that pleadings must contain a "short and plain statement" of the claim.  Fed. R. Civ. P. 8.  Defendants argue that the Second Amended Complaint violates Rule 8 by its length and the purported vagueness of its allegations.  (ECF No. 72 at 6.)  Although the Second Amended Complaint bears considerable length at 292 paragraphs across 58 pages, it

contains a mostly orderly and chronological set of factual allegations before proceeding to the specific allegations underlying the eight counts that it states against 31 defendants. With respect to RCHC Defendants, the Second Amended Complaint specifically alleges that: (a) Defendant RCHC constitutes a contractor responsible for providing medical and mental health care to detainees at ADC; (b) RCHC acts through its employees, including Defendant Sturm and others; (c) a non-medical staff member notified Defendant Sturm that Garcia was not eating or drinking fluids, and that a food log had been ordered; (d) no such food log was ever created; (e) Defendant Sturm took no further action in this regard; and (f) Garcia died of starvation and dehydration after significant weight loss. (2d Am. Compl. ¶¶ 21–22, 68, 76–77.) The Second Amended Complaint further alleges with respect to Defendant RCHC that "RCHC's doctors, psychiatrists and therapists observed Mr. Garcia's serious medical condition and refused and/or failed to provide timely and appropriate intervention." (*Id.* ¶ 269.) Finally, the Second Amended Complaint proceeds to identify the specific counts alleged against RCHC Defendants. (*Id.* ¶¶ 103–292.)

While the Second Amended Complaint does not represent a model of clarity, the Court finds that it nonetheless satisfies Rule 8, which requires only that a pleading "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.[14] As discussed above, the factual allegations against RCHC Defendants are intelligibly set

---

[14] The Court finds RCHC's caselaw largely inapposite; cases where courts found a complaint "argumentative, prolix, replete with redundancy, and largely irrelevant," or where the complaint spanned nearly 300 pages, are easily distinguishable from the instant case. *Cafasso, U.S. ex rel. v. Gen'l Dynamics C4 Sys., Inc.*, 637 F.3d 1037, 1058 (9th Cir. 2011); *Thousand Oaks Barrel Co., LLC v. Deep South Barrels LLC*, 241 F. Supp. 3d 708, 713 (E.D. Va. 2017).

Defendants also argue that similar claims were dismissed against them in *Johnson v. Rappahannock Reg'l Jail Auth.*, No. 1:23-cv-1024 (E.D. Va. March 22, 2024), a recent case before this Court. Since the Order that Defendants cite does not explain how the Court reached

forth and provide ample notice for purposes of *Twombly* as to Plaintiff's various remaining claims. The Court will therefore deny RCHC Defendants' Motion to Dismiss based on Rule 8.

### b. Claims Against Defendant Sturm

The Court next reviews the claims against RCHC Defendants, beginning with Defendant Sturm, ADC's Medical Director. As discussed above, Plaintiff asserts claims of negligence (Count One), gross negligence (Count Two), supervisory liability (Count Five) and deliberate indifference (Count Seven) against Sturm. The pertinent allegations reveal that a jail therapist informed him that Garcia, a detainee in ADC's care who was housed in the mental health pod, was neither eating nor drinking, and that Sturm did nothing in response. (2d Am. Compl. ¶ 76.)[15] Garcia subsequently died from his failure to eat or drink. (*Id.* ¶ 102.) The Court begins by considering Plaintiff's constitutional claims before proceeding to his claims for negligence and gross negligence.

The Court finds that Defendant Sturm's alleged failure to respond to Garcia's serious medical need demonstrates deliberate indifference and stands sufficient to state a claim under § 1983. Garcia's condition — failing to eat or drink for an extended period — qualifies as sufficiently serious "that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto*, 841 F.3d at 225. Indeed, Defendant Coots, a jail therapist (but not a medical doctor), recognized the danger and alerted Defendant Sturm. (2d Am. Compl. ¶¶ 75–76.)

---

its decisions, the Court is unable to compare the arguments to the facts and circumstances in the instant case.

[15]    Defendant Sturm appears to concede that he is a "*de facto* state actor" who was "carrying out government functions." (ECF No. 72 at 15.) This concession comports with the Supreme Court's longstanding recognition that § 1983 actions "can *sometimes* impose liability upon a private individual," as under the circumstances present here. *Wyatt v. Cole*, 504 U.S. 128, 162 (1992).

Sturm's inaction in the face of these "known medical needs raises an inference of deliberate indifference to those needs" under Fourth Circuit law. *Scinto*, 841 F.3d at 226 (cleaned up). In light of Sturm's inaction and taking the facts alleged as true, the Court finds that Plaintiff plausibly states a claim for deliberate indifference on the part of Defendant Sturm.

Defendant Sturm's claim of qualified immunity fails for the same reasons as Defendant Finn's.[16] *See supra* Section III.D.1; c*f. Gordon*, 971 F.2d at 1094 (recognizing "a duty to protect prisoners from self-destruction or self-injury"). Given the allegation that Defendant Sturm knew of Garcia's concerning failure to eat or drink, and given the Court's prior analysis and its obligation to take these facts as true at this juncture, Plaintiff plainly establishes that Defendant Sturm's actions violated a clearly established right. For all of these reasons, the Court finds that Plaintiff has met his burden to state a claim for deliberate indifference under § 1983 as to Defendant Sturm and will deny his Motion to Dismiss in that regard.

As to Plaintiff's claim of supervisory liability pursuant to § 1983 (Count Five), the Court will grant Defendant Sturm's Motion to Dismiss. Plaintiff's claim fails to establish that the alleged unconstitutional conduct proved "widespread" or "at least [occurred] on several different occasions," as required under Fourth Circuit law. *Shaw*, 13 F.3d at 799. Although Plaintiff alleges a widespread failure to respond to the medical needs of inmates and detainees, (2d Am. Compl. ¶ 164), he states no facts in support of this claim and provides no examples beyond what happened to Mr. Garcia. As the Supreme Court has repeatedly cautioned, such formulaic and

---

[16]    This Court assumes without deciding, for purposes of this Motion to Dismiss, that Defendant Sturm could be entitled to qualified immunity as a private individual. *See Hoskins v. Wexford Health Sources, Inc.*, 2019 WL 1167815, at *10 (D. Md. Mar. 13, 2019) (noting a lack of Fourth Circuit authority and that "[c]ircuits are divided on whether privately employed doctors who provide services at prisons or hospitals pursuant to state contracts are entitled to assert qualified immunity").

threadbare allegations are insufficient to state a claim. *Iqbal*, 556 U.S. at 678; *see Wiggins v. Queensberry*, 222 F. Supp. 3d 490, 502 (E.D. Va. 2016) (granting motion to dismiss where the plaintiff failed "to allege *any* facts indicating that there were past incidents of wrongful behavior" or that the defendant "knew about any past misconduct or tendency towards misconduct"). Accordingly, the Court will grant Sturm's Motion to Dismiss with respect to the supervisory liability claim against him.

As to Counts One (negligence) and two (gross negligence), Defendant Sturm challenges Plaintiff's claims primarily on the basis that Garcia never affirmatively sought a doctor-patient relationship with him and that Sturm did not owe Garcia a "general affirmative duty to [] provide health care." (ECF No. 72 at 8.) District courts in the Fourth Circuit have regularly rejected such arguments.[17] These decisions are consistent with Virginia law, which recognizes the special duty of care owed by one who exercises total dominion over another, such as in a prison setting, and which courts have extended to private entities and individuals in such contexts. *See, e.g.*, *Quisenberry v. Huntington Ingalls Inc.*, 818 S.E.2d 805, 812 (Va. 2018) (discussing duty to use ordinary care and skill to avoid injury when entrusted with care of another); *Dudley v. Offender Aid & Restoration of Richmond, Inc.*, 401 S.E.2d 878, 881, 883 (Va. 1991) (finding a half-way house could be liable for its negligence where it "undertook a responsibility for very close and continuous supervision of its inmates"). Here, the Second Amended Complaint alleges

---

[17]    *See Adams v. Naphcare, Inc.*, 244 F. Supp. 3d 546, 551 (E.D. Va. 2017) (rejecting the argument that a medical services administrator owed no affirmative duty, because the defendant "owed a duty to [inmate] to see that he was provided quality and appropriate medical care" and the complaint "permits the plausible inference that [defendant] was familiar with the care provided to each inmate"); *Kovari v. Brevard Extraditions, LLC*, 461 F. Supp. 3d 353, 388 (W.D. Va. 2020) (holding that prison transport company owed a duty of care to prisoner that it was transporting "beyond ordinary care owed anyone"); *Garrett v. Virginia*, 2021 WL 3193176, at *7 (E.D. Va. July 28, 2021) (holding that plaintiff plausibly alleged that administrators "violated their independent duty to administer" a correctional program).

that Defendant Sturm and RCHC were obligated, under RCHC's contract with the Jail Board and ADC, to provide medical and mental health care to ADC detainees, and that Defendant Sturm failed to provide adequate services after receiving actual notice of Garcia's acute needs.[18]  (2d Am. Compl. ¶¶ 21, 76–77.)  These allegations suffice to manifest a duty on Defendant Sturm's part.  Defendant Sturm, as the Medical Director charged with ensuring medical care for all detainees at ADC, cannot avoid liability here simply by disclaiming responsibility for detainees of whose medical needs he personally possessed knowledge.[19]  Given the Court's finding that Plaintiff already stated a plausible claim for deliberate indifference, and consistent with the earlier finding that such a claim necessarily establishes gross negligence and negligence, the Court finds that Plaintiff validly states a claim for negligence (Count One) and gross negligence (Count Two) against Defendant Sturm.

---

[18]     Defendant Sturm argues that, because Plaintiff only alleges nonfeasance based on contract, Plaintiff has failed to allege sufficient facts for this Court to determine that Garcia was an intended third-party beneficiary of the contract.  However, Plaintiff's claims do not sound in contract, but instead rest on the special relationship between inmates or detainees and those designated to care for them.  As Defendant Sturm himself cites, where "the relation of the plaintiff and the defendants be such that a duty arises from that relationship, irrespective of the contract, to take due care, and the defendants are negligent, then the action is one of tort."  (ECF No. 72 at 8 (citing *Richmond Metro. Auth. v. McDevitt St. Bovis*, 507 S.E.2d 344, 347 (1998)).)  Even assuming *arguendo* that Plaintiff's claims rely on the contract for medical services to inmates between RCHC and the Jail Board, Garcia and other inmates — the prospective recipients of such medical care — constitute the obvious intended third-party beneficiaries of that contract.

[19]     Defendant Sturm's reliance on medical malpractice cases, where liability is necessarily predicated on an affirmative patient-doctor relationship, is inapposite to this case.  (*See* ECF No. 72 at 9 (citing *Prosise v. Foster*, 544 S.E.2d 331 (Va. 2001)).)
          The Court also notes that accepting Sturm's contrary argument would lead to an absurd result:  private doctors contracted by the Commonwealth to provide medical care to prisoners could avoid any duty of care (and thus liability) to those prisoners simply by refusing to provide them with any care at all.

Defendant Sturm seeks protection against Plaintiff's ordinary negligence claim under the doctrine of sovereign immunity. Based on the facts before it, the Court cannot find that Sturm's inaction in the face of Garcia's serious health condition constituted an "act[] of judgment and discretion . . . necessary to the performance of essential governmental functions." *Craft*, 2022 WL 2079312 at *28. As this Court previously found, "deciding whether to let a pretrial detainee under one's care thirst and starve to death . . . does not require the exercise of much, if any, discretion or judgment." *Adams v. NaphCare, Inc.*, 243 F. Supp. 3d 707, 720 (E.D. Va. 2017); *see also Pike v. Hagaman*, 787 S.E.2d 89, 93 (Va. 2016) ("[R]egardless of the existence of discretion in the overall job, there is no sovereign immunity for the negligent performance of ministerial acts."); *Jennings v. Hart*, 602 F. Supp. 2d 754, 759 (W.D. Va. 2009) (rejecting sovereign immunity argument due to lack of discretion); *Riddick v. Watson*, 503 F. Supp. 3d 399, 430 (E.D. Va. 2020) (same). Accordingly, the Court finds that Defendant Sturm does not stand entitled to sovereign immunity for his failure to care for Garcia and will deny his Motion to Dismiss on these grounds.

### c.    Claims Against Defendant RCHC

RCHC seeks dismissal of all counts against it, including Plaintiff's claims of negligence (Count One), gross negligence (Count Two) and deliberate indifference (Count Seven). RCHC makes many of the same arguments as Defendant Sturm; given its different position as a private entity, however, variations in the Court's analysis result in different outcomes.

Beginning with deliberate indifference, this Court has recognized that "a private entity may, in certain cases, act under color of law within the meaning of § 1983 and therefore be exposed to liability" under that statute. *Riddick*, 503 F. Supp. 3d at 415. The Fourth Circuit observed that a private entity may act under color of law for purposes of § 1983 when it

"exercise[s] powers that are traditionally the exclusive prerogative of the state." *Conner v. Donnelly*, 42 F.3d 220, 224 (4th Cir. 1994). "The provision of medical services to inmates" falls squarely within that category. *Id.*; *see also West v. Atkins*, 487 U.S. 42, 56 (1988) (recognizing that a state has a "constitutional duty to provide adequate medical treatment to those in its custody"). Here, Plaintiff alleges that RCHC contracted with the Jail Board to provide medical, mental health and psychiatry services to detainees at ADC. (2d Am. Compl. ¶ 21.) This allegation therefore brings RCHC's actions within the purview of § 1983.

However, because RCHC constitutes a private entity, not an individual, the standards that govern § 1983 liability of municipalities under *Monell* apply. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) (recognizing "that the principles of § 1983 municipal liability articulated by *Monell* and its progeny apply equally to a private corporation that employs" individuals working in prisons). As outlined above, to be liable in a § 1983 action, entities (like RCHC) must have maintained an official policy or custom causing a constitutional injury; they cannot be found liable on *respondeat superior* principles alone. *See supra* Section III.C.3. Here, the Second Amended Complaint fails to allege any sort of policy or custom on the part of RCHC that would satisfy *Monell*. Indeed, Plaintiff's Opposition did not seek to rebut RCHC's arguments to this effect. Accordingly, the Second Amended Complaint fails to state a § 1983 claim against RCHC. The Court will therefore dismiss Count Seven as to RCHC.

As to negligence and gross negligence, Plaintiff asserts liability on the part of RCHC under a *respondeat superior* theory. (2d Am. Compl. ¶ 22.) This claim necessarily rises and falls with Plaintiff's claim against Defendant Sturm, RCHC's employee. Since the Court determined that Plaintiff stated a valid claim against Sturm, and since the facts as alleged indicate that Defendant Sturm acted within the scope of his employment as Medical Director, the

38

Court finds that Plaintiff also states a valid claim for negligence and gross negligence against Defendant RCHC. *See Riddick*, 503 F. Supp. 3d at 432 (concluding that claims against employer survived motion to dismiss as premised on liability of employees). Thus, RCHC's Motion to Dismiss will be denied as to these counts.

*       *       *

In short, the Court will grant in part and deny in part RCHC Defendants' Motion to Dismiss. As to Defendant Sturm, the Court will grant the Motion as to Count Five. As to Defendant RCHC, the Court will grant the Motion as to Count Seven. The Court will deny the Motion as to all other remaining counts against RCHC Defendants.

### 3.    The Correctional Officers' Motion to Dismiss

Correctional Officer Defendants face remaining claims of negligence (Count One), gross negligence (Count Two) and deliberate indifference under § 1983 (Count Six). In moving the Court to dismiss all counts against them, Correctional Officer Defendants raise the following arguments: (1) Plaintiff has failed to state his § 1983 claim based on deliberate indifference; (2) Plaintiff has failed to allege any state tort claim; and (3) the Correctional Officers stand entitled to sovereign immunity.[20] (ECF No. 74 at 4–9, 13–18.)

For the reasons set forth below, the Correctional Officers' motion to dismiss will be denied as to all Correctional Officer Defendants for Counts Two (gross negligence) and Six (deliberate indifference). As to Count One (negligence), the Motion will be denied regarding Defendants Hendricks, James, Lindsey, McDonald, Ralls and Williams. The Court will grant the Motion as to Count One for the remaining Correctional Officer Defendants.

---

[20]    In their Motion, Correctional Officer Defendants also made a cursory reference to dismissal on the basis of qualified immunity, an argument that they subsequently withdrew in their reply brief. (ECF No. 74 at 4; ECF No. 93 at 4 n.7.)

#### a.    Section 1983 Deliberate Indifference

Count Six asserts a claim of deliberate indifference against all Correctional Officer Defendants.  Plaintiff alleges that all nine Correctional Officer Defendants interacted with Garcia on a daily basis and that each knew that Garcia suffered from mental health issues, either from participating in his intake or by virtue of his placement in the C Pod Mental Health Unit.  (2d Am. Compl. ¶¶ 230, 235.)  Plaintiff also alleges that food waste was collecting in Garcia's cell (supported by a picture in the Second Amended Complaint), that Garcia lost nearly thirty pounds in approximately three weeks at ADC, that officers had to assist Garcia in showering and that Garcia ultimately died as a result of Correctional Officer Defendants' actions and inactions.  (*Id.* ¶¶ 68, 79, 81, 102; *id.* at 23.)  With respect to individual officers, the Second Amended Complaint specifically alleges the following:  (1) Defendants Thompson, Daniels and Tracy Allen participated in, or were present for, Garcia's intake; (2) Defendant Hendricks was in Garcia's cell when Garcia began grabbing his chest (indicating that he was experiencing chest pains) and appears to have notified Nurse Mobley in response, but took no further steps to have Garcia transferred to the medical unit or the hospital; and (3) Defendants James, McDonald and Williams each interacted with Garcia on the day of his death and observed that he had not eaten any food, but took no further action to procure medical attention for him.  (*Id.* ¶¶ 47–49; 81–82; 85–93.)[21]

The Court begins by considering Defendant Hendricks' actions.  As with Defendants Finn and Sturm discussed *supra*, the Court finds that Hendricks' awareness of Garcia's situation,

---

[21]    Plaintiff alleges that "ADC officers" notified Defendant Coots on May 10, 2022 that Garcia was "displaying strange behavior," but does not allege specifically who did so.  (2d Am. Compl. ¶ 74.)  Defendants' implicit assertion that *all* Pod C officers made this notification mischaracterizes Plaintiff's allegation.  (ECF No. 74 at 6.)

paired with his failure to respond to Garcia's serious medical need, demonstrates deliberate indifference and suffices to state a claim under § 1983.  Hendricks interacted with Garcia daily, collected food and trash from Garcia's cell (because he was not eating), was aware of Garcia's visibly deteriorating condition and took no action to ensure that Garcia received help related to his failure to eat or drink.  As discussed previously, Garcia's condition qualifies as sufficiently serious "that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto*, 841 F.3d at 225.  While Defendant Hendricks notified Nurse Mobley on May 11, 2022 about Garcia's chest pains, this action alone does not immunize Hendricks from potential § 1983 liability under Fourth Circuit precedent.[22]  Rather, in light of the additional eleven days during which Hendrick observed Garcia's continuing deterioration and took no further action to obtain medical help, the Court finds that Hendricks "recklessly . . . failed to act to appropriately address the risk" posed by Garcia's condition, and that he "should have known" that Garcia was suffering from malnutrition and that his nonaction in the face of Garcia's deterioration "posed an unjustifiably high risk of harm" and ultimately harmed Garcia.  *Short*, 87 F.4th at 611.  As such, Plaintiff sets forth sufficient facts to satisfy all four requirements for a claim of deliberate indifference to a medical need under § 1983 against Defendant Hendricks.

---

[22]    In *Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023), a detainee told a correctional officer that she was suicidal and withdrawing from daily drug use, but the officer did nothing and the detainee attempted suicide and later died.  *Id.* at 612–13.  In seeking dismissal of the § 1983 claim against her, the officer argued that she was entitled to rely on two nurses who had examined the detainee and also took no ameliorative steps.  *Id.* at 614.  The Fourth Circuit held that the officer could not "use the Medical Defendant's conduct or failure to act to shield her from liability on these facts," because "[h]olding otherwise would shield non-medical defendants from liability whenever a medical provider was at some point consulted."  *Id.*  The court also discussed *Iko v. Shreve*, 535 F.3d 225 (4th Cir. 2008), and found that the facts in *Short* and *Iko* were distinguishable from other cases, because it "is undisputed that [the detainees in these cases] received *no* medical treatment whatsoever" such that there "was *no* medical opinion to which the officers could have deferred."  *Id.* (citing *Iko*, 535 F.3d at 242 (emphasis in original)).  Given the similar factual predicate, this Court will follow *Short* and *Iko* in the instant case.

The Court reaches the same result for Defendants James, McDonald and Williams. Each of these Defendants interacted with Garcia on the day of his death, noted his lack of eating and sought no further attention for him until he was fully unresponsive. Based on the pictures included in the Second Amended Complaint, the Court finds it implausible that any Defendant entering Garcia's cell would not have immediately noticed the accumulating containers of uneaten food. Given Defendants' daily interactions with Garcia in the preceding three weeks, and given their inaction in the face of an increasingly serious medical condition during this time, the Court finds that Plaintiff plausibly states a claim of deliberate indifference against these three correction officers for the same reasons articulated as to Defendant Hendricks.

The Court finds that Plaintiff also plausibly alleges deliberate indifference against Defendants Tracy Allen, Daniels, Lindsey, Ralls and Thompson. As discussed *supra*, Plaintiff alleges that each Correctional Officer Defendant had daily interactions with Garcia, observed his deterioration, and took no action in the face of his serious medical condition. (2d Am. Compl. ¶¶ 230, 235.) In light of Garcia's serious and obvious condition, with which these defendants were confronted on a daily basis, and in light of their lack of action to obtain medical help, the Court finds that the remaining Correctional Officer should have known that nonaction posed an unjustifiably high risk of harm and recklessly failed to appropriately address these risks. As such, Plaintiff sets forth sufficient facts to satisfy the requirements for a claim of deliberate indifference to a medical need under § 1983 against these Correctional Officer Defendants as well. *Short*, 87 F.4th at 611.

Defendants' claim that Plaintiff's allegations constitute "impermissible, conclusory allegations against Correctional Officers as a group which fail to allege their personal involvement" lacks merit. (ECF No. 74 at 8.) Here, the remaining Correctional Officer

42

Defendants are each alleged to have played substantially similar roles: in their daily interactions with Garcia, they are alleged to have observed his failure to eat or drink and his deteriorating state, and to have done nothing. As such, the Court's finding of a valid deliberate indifference claim against each officer stands justified on the facts as pleaded and aligns with this Court's prior opinions. *See, e.g.*, *Riddick*, 503 F. Supp. 3d at 421 (denying a motion to dismiss where the plaintiff alleged that "*each* of these defendants came into contact with the Decedent at some point during her incarceration and learned by looking at or listening to the Decedent that she needed immediate medical assistance" (emphasis in original)).

Given the Court's obligation to accept Plaintiff's allegations as true, and given the Court's findings with regard to Defendants Hendricks, James, McDonald and Williams, the Court finds that the remaining Correctional Officers "recklessly . . . failed to act to appropriately address the risk" posed by Garcia's malnutrition, and that they, too, "should have known" that Garcia was suffering from malnutrition and that nonaction "posed an unjustifiably high risk of harm." *Short*, 87 F.4th at 611.[23] Accordingly, the Court finds that Plaintiff has stated a plausible claim of deliberate indifference under § 1983 against each of the individual Correctional Officer Defendants and will deny their Motion to Dismiss with respect to Count Six.

### b.    Tort Claims and Sovereign Immunity

Before addressing Plaintiff's state law claims against Correctional Officer Defendants, the Court acknowledges the same defect in Plaintiff's pleadings as with Defendant Finn. *See supra* Section III.D.1. Despite raising claims against Correctional Officer Defendants under Counts One, Two and Six, key factual allegations — in particular, the allegations that all

---

[23]    Correctional Officer Defendants' citation to *McLin v. VA Dept. of Corr.*, 2020 WL 448260 (W.D. Va. Jan. 28, 2020) is inapposite here, given the *McLin* Court's express references to the "different positions and . . . distinct roles" of the defendants in that case. *Id*. at *2.

Correctional Officer Defendants "interacted with Mr. Garcia on a daily basis" and possessed "specific knowledge that Mr. Garcia suffered from mental illness" —appear only in the section of Plaintiff's Complaint concerning Count Six. (2d Am. Compl. ¶¶ 230, 235.) While Count Two expressly "incorporates by reference each preceding and succeeding paragraph," Count One incorporates only the Complaint's preceding portions and therefore fails to include these specific allegations. (*Id.* ¶¶ 103, 110.) Thus, when analyzing Count One, the Court must limit its review of the factual allegations accordingly and cannot consider facts that Plaintiff alleges only in later sections of the Second Amended Complaint.

As to Count Two, in light of the Court's prior finding that Plaintiff states a valid claim for deliberate indifference against all Correctional Officer Defendants, and since such claims simultaneously establish valid claims for gross negligence under Fourth Circuit law, the Court finds that Plaintiff also states a valid claim of gross negligence against all Correctional Officer Defendants. *Cf. Rucker*, 2021 WL 3863346, at *8 (denying motion to dismiss claims of gross negligence for similar reasons). However, since Plaintiff failed to incorporate several of the underlying factual allegations into Count One, the Court must inquire as to whether the remaining factual allegations suffice to state a claim for ordinary negligence against Correctional Officer Defendants. These remaining allegations include the specific allegations against Officers Hendricks, James, McDonald and Williams discussed above, (2d Am. Compl. ¶¶ 81–82, 85–93,) as well as general allegations against all Correctional Officer Defendants. (*Id*. ¶¶ 19, 28, 66, 70, 79.)

As to Hendricks, James, McDonald and Williams, the Court finds that Plaintiff plausibly states a claim for ordinary negligence. Like Defendant Sturm, the Court easily finds that all Correctional Officers Defendants owed Garcia a duty of care as an inmate in their custody under

Virginia law.  *See, e.g.*, *Quisenberry*, 818 S.E.2d at 812 (discussing duty to use ordinary care and skill to avoid injury when entrusted with care of another).  Plaintiff alleges at least one instance where each of these four Defendants observed Garcia in a situation evincing serious medical need and failed to ensure that he obtained medical assistance; these instances of inaction sufficiently demonstrate failure to "use the degree of care that an ordinarily prudent person would exercise under similar circumstances."  *Cowan*, 603 S.E.2d at 918.  Plaintiff plausibly alleges that these various breaches individually and collectively led to Mr. Garcia's death, satisfying the causation and injury requirements.  (2d Am. Compl. ¶¶ 108, 109.)  The Court therefore finds that Plaintiff states a valid claim for ordinary negligence against Defendants Hendricks, James, McDonald and Williams.

The Court reaches the same outcome for Defendants Lindsey and Ralls.  Even excluding the specific allegations pled under Count Six (but not incorporated into Count One) that these Officers "interacted with Mr. Garcia on a daily basis" and that they possessed "specific knowledge that Mr. Garcia suffered from mental illness," (2d Am. Compl. ¶¶ 230, 235), the Court finds that the remaining allegations sufficiently establish that Defendants Lindsey and Ralls possessed specific knowledge of Garcia's deteriorating medical state and failed to act in the face of that knowledge.  (*See id.* ¶¶ 28, 70 (alleging that these Correctional Officer Defendants were among those "assigned to the C Pod" and were "responsible for conducting adequate and timely security rounds," and that Garcia's "malnutrition and dehydration were obvious and known to all of the Defendants who made security and medical rounds").)  Given the Court's prior finding as to the special duty owed by all Correctional Officer Defendants to Garcia as an inmate in their care, the Court easily finds that Lindsey's and Ralls' inaction evinced a failure to "use the degree of care that an ordinarily prudent person would exercise under similar

circumstances" sufficient to plausibly state a claim for ordinary negligence.  *Cowan*, 603 S.E.2d at 918.

Plaintiffs' allegations as currently pled fall short, however, against Defendants Tracy Allen, Daniels and Thompson — the officers present at Garcia's intake.  Excluding the specific allegations pled under Count Six, Plaintiff alleges that these three officers were all "aware of Mr. Garcia's serious medical condition" at the time of his intake processing and subsequently assigned him to Pod 18C "for further mental health review."  (2d Am. Compl. ¶¶ 51, 61.)  While Plaintiff alleges that an "adequate assessment and examination at intake . . . would have revealed Mr. Garcia's . . . need for immediate medical attention," the Court finds that this allegation, without more facts in support, lacks sufficient specificity to raise it from the merely possible to the plausible, as required by *Twombly*.  Furthermore, while Plaintiff alleges that "[n]o mental health assessment was ever completed by any of the Defendants to evaluate Mr. Garcia's condition" after the intake assessment, nothing in the Second Amended Complaint suggests that this failure falls on the intake officers' shoulders.  (*Id.* ¶ 61.)  Given that the intake officers were not specifically assigned to C Pod and that Plaintiff does not allege that these officers conducted security or medical rounds, and absent the allegation contained in Count Six that Tracy Allen, Daniels and Thompson "interacted with Mr. Garcia on a daily basis," (*Id.* ¶ 230,) the Court finds the remaining allegation — that these officers "knew that Mr. Garcia was unable or unwilling to eat food and drink fluids independently" (*Id.* ¶ 66) — insufficiently specific to support a claim for negligence.  Plaintiff therefore fails to state a valid claim for ordinary negligence against Defendants Tracy Allen, Daniels and Thompson.

To the extent that Defendants Hendricks, James, Lindsey, McDonald, Ralls and Williams argue that they are shielded from claims of ordinary negligence under sovereign immunity, the

Court disagrees.  As the Court previously noted with regard to Defendant Sturm, the choice to "let a pretrial detainee under one's care thirst and starve to death . . . does not require the exercise of much, if any, discretion or judgment."  *Adams*, 243 F. Supp. 3d at 720; *see Jennings*, 602 F. Supp. 2d at 759 (denying application of sovereign immunity where defendants ignored detainee's worsening physical conditions); *Riddick*, 503 F. Supp. 3d at 430 (denying application of sovereign immunity for defendants where "the question is not what was the proper course of treatment, which is clearly a discretionary choice, but rather whether to provide her even the most basic level of medical care while she was in obvious distress").  Here, these six Defendants allegedly encountered Garcia in varying states of acute distress, yet took no action to ensure that he received urgently needed medical care.  Accordingly, Defendants fail to establish that their actions "involved the use of judgment and discretion" as required to claim sovereign immunity protections.  *Messina*, 321 S.E.2d at 663.

To resist this outcome, Defendants invoke prior decisions by this Court concerning sovereign immunity for correctional officers; these cases rest on significantly different facts, however, and are easily distinguished.  For example, in *Dallas v. Craft*, 2022 WL 2079312 (E.D. Va. June 9, 2022), the deceased inmate was referred to the medical station several times, where he was seen by nurses and doctors.  *Id.* at *5–6.  This Court found that the correctional officers exercised judgment in determining whether and when to allow the decedent to proceed to the medical station, whether to follow up with medical personnel and when to transport the decedent to the emergency room.  *Id.* at *28.  These discretionary decisions stand in stark contrast to Defendants' complete inaction in this case, which amounted to a binary decision between procuring some kind of care or effectively allowing an inmate to starve to death.

Likewise, in *Dowdy v. Pamunkey Regional Jail Authority*, 2014 WL 2002227 (E.D. Va. May 15, 2014), the Court held that the decision of where to house a detainee involves the exercise of discretion and judgment, given that it requires officers to "screen for 'dysfunctional' behaviors, personally interview each arriving individual, and make prison housing decisions and assignments based on the officers' subjective determinations as to each inmate's physical and psychological needs and abilities." *Id.* at *4. No such discretionary complexities exist here, where Plaintiff challenges Defendants' decision not to provide any help to Garcia when he was in acute distress. Neither case, therefore, dictates a different result as to sovereign immunity from the one found here by the Court.

*     *     *

In sum, the Correctional Officers' Motion to Dismiss will be denied as to all Correctional Officer Defendants for Counts Two (gross negligence) and Six (deliberate indifference). As to Count One (negligence), the Motion will be denied regarding Defendants Hendricks, James, Lindsey, McDonald, Ralls and Williams. The Court will grant the Motion as to Count One for Correctional Officer Defendants Tracy Allen, Daniels and Thompson.

### 4.    Meletis' and Deshields' Motion to Dismiss

The Court turns next to the Motion to Dismiss filed by Defendant Pete Meletis, ADC Superintendent, and Defendant Lt. Gregory Deshields, who bore supervisory responsibility for all ADC correctional officers, including those in C Pod, during the time of Garcia's detention. Defendants Meletis and Deshields seek to dismiss all remaining claims against them under Counts One (negligence), Two (gross negligence), Four (*Monnell* claim as to Meletis only), Five (supervisory liability) and Six (deliberate indifference as to Deshields only). The Court will analyze each Count in turn.

As to Defendant Deshields, for the reasons set forth below, the Court finds that Plaintiff states a valid claim for deliberate indifference under § 1983 (Count Six), negligence (Count One) and gross negligence (Count Two), but fails to adequately plead supervisory liability under § 1983 (Count Five).  As to Defendant Meletis, the Court will grant Meletis' motion to dismiss in its entirety.

### a.    Section 1983 Deliberate Indifference (Count Six - Deshields)

Plaintiff asserts that Defendant Deshields was deliberately indifferent to Garcia's serious medical needs, alleging that Deshields (like Correctional Officer Defendants) interacted with Garcia on a daily basis and knew that he suffered from a mental illness by virtue of his placement in C Pod.  (2d Am. Compl. ¶¶ 230, 235.)[24]  Plaintiff further alleges that Deshields had specific knowledge of Garcia's deteriorating health and that Garcia experienced weight loss at a rate that would have been noticeable to anyone who, like Deshields, interacted with him on a daily basis.  (*Id.* ¶¶ 68, 79–80.)  Deshields, meanwhile, did nothing to obtain medical assistance for Garcia.  (*Id.* ¶ 225.)  These allegations closely mirror the facts alleged against the similarly situated Correctional Officer Defendants, who also encountered Garcia on a daily basis and did not procure basic medical assistance for him, despite the clear and serious medical need that he presented, and which the Court found sufficient for a claim of deliberate indifference to medical

---

[24]    Defendant Deshields asserts that "Plaintiff does not allege that Lt. Deshields was responsible for conducting rounds."  (ECF No. 76 at 8.)  The Court disagrees.  Plaintiff alleges that Deshields was responsible "for supervising ADC correctional officers in all tasks, including but not limited to conducting adequate and timely security rounds."  (2d Am. Compl. ¶ 29.)  While Plaintiff's allegation fails to specify whether the "including" clause refers to "supervising" or "tasks," this Court must draw all reasonable inferences in favor of Plaintiff and therefore construes this paragraph to allege that Defendant Deshields conducted security rounds.  *See Barbour v. Garland*, 105 F. 4th 579, 598 (4th Cir. 2024) (reversing district court where "the district court failed to draw all reasonable inferences" in the plaintiff's favor).  This construction comports with Plaintiff's later allegation that Defendant Deshields "interacted with Mr. Garcia on a daily basis."  (2d Am. Compl. ¶ 230.)

need.  *See supra* Section III.D.3.a.  Consequently, the Court finds that Deshields' failure to obtain basic medical assistance in the face of Garcia's clear and serious medical need also supports a claim for deliberate indifference.  *Scinto*, 841 F.3d at 225 (recognizing that a "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference," and that a medical condition may be "so obvious that even a lay person would easily recognize the necessity for a doctor's attention").  For the same reasons that the Court set forth with regard to the similarly situated Correctional Officer Defendants, the Court will therefore deny Defendant Deshields' motion to dismiss Count Six.

### b.    Section 1983 Supervisory Liability (Count Five - Deshields and Meletis)

Plaintiff also asserts claims for supervisory liability under § 1983 against Defendants Deshields and Meletis.  As with Defendant Medical Director Sturm, Plaintiff's supervisory claim fails to establish that any underlying unconstitutional conduct proved "widespread" or "at least [occurred] on several different occasions," as required under Fourth Circuit law.  *Shaw*, 13 F.3d at 799.  Although Plaintiff alleges a widespread failure to respond to the medical needs of inmates and detainees, his Complaint states no facts supporting this claim and provides no examples beyond what happened to Mr. Garcia, rendering his supervisory liability allegations conclusory.  (*See, e.g.*, 2d Am. Compl. ¶ 222 (alleging that "Deshields was aware or should have been aware that officers under his care frequently failed to conduct complete and adequate security rounds").)  Accordingly, and for the same reasons set forth with regard to Defendant Sturm, the Court will grant Defendants Meletis and Deshields' Motion with respect to the supervisory liability claims against them.

### c.    Section 1983 *Monell* Claim (Count Four - Meletis)

Plaintiff asserts four versions of a § 1983 municipal liability claim against Defendant Meletis as ADC's Superintendent, based on (1) the ADC's express policy for the "handling [of] mentally impaired inmates"; (2) Meletis' alleged ratification of his subordinates' constitutionally deficient actions; (3) Meletis' alleged failure to train subordinates to adequately care for the health and safety of detainees at ADC; and (4) a persistent or widespread custom at ADC of *not* providing timely or adequate care.  (*Id.* ¶¶ 133–44.)  Because Plaintiff fails to allege sufficient facts to support his *Monell* claim under any of these theories, as explained more fully below, the Court will grant Defendant Meletis' Motion to Dismiss as to Count Four.

With respect to Plaintiff's express policy argument, the Second Amended Complaint references "the one-and-a-half-page policy of the ADC for the 'handling [of] mentally impaired inmates,'" which allegedly proves "inherently and facially deficient because it was significantly vague and ambiguous."  (*Id.* ¶ 133.)  In so arguing, Plaintiff fails to properly identify the specific policy and provides no details as to what the policy covers or contains.  District courts in the Fourth Circuit have repeatedly rejected *Monell* claims based merely on "broad allegation[s] that the officers were acting under some unidentified official policy."  *Lizotte v. Finley*, 2019 WL 2865864, at *7 (S.D. W. Va. July 2, 2019); *see Inser v. City of Elkins*, 2022 WL 1750630, at *4 (N.D. W. Va. May 31, 2022) (finding insufficient allegations of an express policy where "[t]he Complaint includes only a conclusory statement that such a policy exists and then cites the facts at issue in this case"); *Burns v. Ashraf*, 2019 WL 4169838, at *8 (D. Md. Sept. 3, 2019) (dismissing claim after finding that the court could not infer an express policy based on plaintiff's conclusory statements).  Accordingly, and in the absence of any details whatsoever

concerning ADC's purported policy, the Court finds that Plaintiff has failed to state a *Monell* claim based on an express policy.

To the extent that Plaintiff's claim against Defendant Meletis rests on his authority as a final decision-maker, Plaintiff fails to sufficiently allege that Defendant Meletis ratified the decisions of any subordinate. Plaintiff asserts, in conclusory fashion, that Meletis "tacitly approved of or ratified the actions of lower ranking officials in allowing the conditions and lack of medical attention described herein." (2d Am. Compl. ¶ 137.) Yet, Plaintiff fails to state any specific facts supporting such a finding. Nor does he establish that the alleged practices were "persistent and widespread" and of such "duration and frequency" to provide Meletis with either actual or constructive notice of their unconstitutionality. *Owens*, 767 F.3d at 402. This Court has rejected similarly conclusory ratification claims where no "facts to support an inference that such ratification occurred" existed and where there were "no facts suggesting such a custom, much less a ratification" actually occurred. *Jackson v. Town of Farmville*, 2023 WL 3871697, at *6–7 (E.D. Va. June 7, 2023). Accordingly, the Court finds that Plaintiff fails to state a *Monell* claim based on ratification.

The Court next considers Plaintiff's failure-to-train claim. While Plaintiff does not allege any facts concerning the actual training that Meletis and ADC provided to ADC staff, this Court has recognized that the "most common way to plead a failure to train claim is to allege a pattern of similar constitutional violations by untrained employees." *Lee v. City of Richmond*, 2013 WL 1155590, at *7 (E.D. Va. Mar. 19, 2013). In such instances, the "need for more or different training" is sufficiently obvious to permit an inference of deliberate indifference on the part of the policymakers. *City of Canton*, 489 U.S. at 390. Yet, as the Court already discussed in the

context of Plaintiff's supervisory liability claims, Plaintiff fails to plead such a pattern of violations with any specificity whatsoever.  Rather, Plaintiff's only specific allegations concern the treatment of Garcia — which does not suffice for a *Monell* claim.  *See Lee*, 2013 WL 1155590 at *7 (dismissing failure-to-train claim where plaintiff alleged mere conclusions regarding only "this particular situation in this particular instance"); *Green v. Mills*, 2020 WL 2850177, at *10 (E.D. Va. June 2, 2020) (dismissing failure-to-train claim where plaintiff only alleged one incident and failed to allege sufficient facts regarding the adequacy of training). Accordingly, Plaintiff has failed to allege sufficient facts supporting a failure to train and therefore fails to state a claim under such a theory.

Finally, Plaintiff fares no better asserting an unconstitutional custom or policy as the basis for his *Monell* claim.  As with his claims for § 1983 supervisory liability, Plaintiff fails to establish with specificity any widespread policy or custom of inadequate medical care for inmates at ADC, let alone a set of practices "so permanent and well settled as to constitute a custom or usage with the force of law."  *Carter*, 164 F.3d at 218.  Plaintiff's specific allegations concern only the treatment of Mr. Garcia; merely alleging that the provision of inadequate health care constituted "the policy and/or custom of Defendants" will not suffice for purposes of a *Monell* claim.  *See Robinson v. Baltimore Cnty.*, 2022 WL 3577267, at *6 ("[A] complaint must allege more than one instance of previous illegal conduct to plausibly allege a *Monell* claim based upon custom."); *Davis v. Lilly*, 2023 WL 6565288, at *5 (W.D. Va. Oct. 10, 2023) ("Allegations of two discrete prior instances, without more, does not establish that the Jail had a custom or practice of unconstitutional excessive force").  Accordingly, in the absence of any specific allegations of a "permanent and well settled" set of unconstitutional practices, Plaintiff

fails to adequately allege an unconstitutional custom or policy supporting his *Monell* claim against Defendant Meletis.

Falling short on all four of his theories for *Monell* liability, the Court finds that Plaintiff fails to state a claim against Defendant Meletis under Count Four and will dismiss this count against him.

### d. Virginia Tort Claims and Sovereign Immunity

Defendants Deshields and Meletis further argue that Plaintiff's claims for ordinary and gross negligence under Counts One and Two should be dismissed or, in the alternative, that they stand protected by sovereign immunity.[25]  The Court addresses the claims against each Defendant in turn.

As to Defendant Deshields, the Court finds that Plaintiff validly states a claim for both ordinary and gross negligence under a direct liability theory.  First, as with the Correctional Officer Defendants, Plaintiff validly states a claim against Deshields for deliberate indifference and incorporated all of the same underlying allegations into Count Two.  Thus, under Fourth Circuit law, Plaintiff also states a valid claim for gross negligence against Deshields.  *See supra* Section III.C.4.  Second, despite the fact that Plaintiff's ordinary negligence claim only "incorporates and realleges all the preceding paragraphs," these preceding paragraphs establish that Deshields possessed specific knowledge of Garcia's medical needs, because they allege that Deshields performed security rounds and ordered officers to escort Garcia to the shower and

---

[25]    The Court notes that Defendant Meletis characterizes Plaintiff's negligence claims against him as "predicated on a theory of *respondeat superior.*"  (ECF No. 76 at 5.)  However, nothing in Plaintiff's filings invokes such a theory with regard to Meletis; Plaintiff's only references to recovering via *respondeat superior* concern claims against ADC and RCHC.  (2d Am. Compl. ¶¶ 22, 292.)  Nor does Plaintiff raise allegations of negligent supervision or hiring in his state law claims against Meletis.  The Court therefore treats Plaintiff's claims against Meletis as predicated on direct liability only, not *respondeat superior.*

assist him with showering.  (2d Am. Compl. ¶¶ 29, 79–80; *supra* n.24.)  These allegations prove sufficiently similar to those underlying the Court's finding of a valid claim for deliberate indifference against Deshields under Count Six; as with gross negligence, such a finding sufficiently establishes ordinary negligence as well.  The Court therefore finds that Plaintiff pleads sufficient facts to support claims of ordinary and gross negligence against Defendant Deshields.

Deshields' claim that sovereign immunity shields him from negligence liability fails to persuade the Court.  As with the relevant Correctional Officer Defendants, Deshields' failure to act in the face of a serious and deteriorating medical situation does not implicate discretion sufficient to trigger sovereign immunity protections.  *See supra* Section III.D.3.b.  The Court therefore finds that sovereign immunity does not protect Defendant Deshields from Plaintiff's claim under Count One.

As to Defendant Meletis, the Court finds no specific allegations in the Second Amended Complaint to support a finding of negligence or gross negligence against him.  Nothing in the Second Amended Complaint establishes, in terms that are not merely conclusory, that Meletis knew about Garcia's detention, let alone his medical needs or his condition.  As such, Plaintiff fails to state any plausible claim of negligence or gross negligence against Meletis under a direct liability theory.  The Court will therefore grant Defendant Meletis' Motion to Dismiss as to Counts One and Two.

*     *     *

In sum, as to Defendant Deshields, the Court finds that Plaintiff adequately pleads deliberate indifference under § 1983 (Count Six), as well as negligence and gross negligence (Counts One and Two), but fails to adequately plead supervisory liability under § 1983 (Count

Five).  The Court will therefore deny Defendant Deshields' Motion to Dismiss as to Counts One, Two and Six, but grant his Motion as to Count Five.  The Court will grant Defendant Meletis' Motion to Dismiss in its entirety, as Plaintiff has failed to establish a plausible claim of § 1983 supervisory liability, a *Monell* claim, or claims for ordinary or gross negligence against him.

### 5.    The Medical Defendants' Motion to Dismiss

Medical Defendants seek dismissal of all remaining claims against them, including Plaintiff's claims of (1) deliberate indifference under § 1983 against all Medical Defendants; (2) supervisory liability under § 1983 against Defendants Archer, Koko and Ochieng; and (3) negligence and gross negligence against all Medical Defendants.  The Court analyzes each of these claims in turn, affording special attention to the different factual predicates for the various Medical Defendants.

For the reasons set forth below, the Court will grant Medical Defendants' Motion to Dismiss as to all counts against Defendant Liagouris.  The Court will also dismiss Count One as to Defendants Amy Allen, Crawford, Koko, Mobley, Ochieng, Revard and Wright, as well as Count Five as to Defendants Archer, Koko and Ochieng.  All other claims against Medical Defendants will proceed.

### a.    Section 1983 Deliberate Indifference (Count Seven)

Plaintiff alleges that each of the Medical Defendants demonstrated deliberate indifference to Garcia's serious medical needs.  For the reasons set forth below, the Court finds that Plaintiff states a valid claim for deliberate indifference against all but two of the Medical Defendants.

As to Defendant Nursing Director Koko and Defendants Amy Allen, Crawford, Mobley, Ochieng, Revard and Wright — all of whom hold credentials as Licensed Practical Nurses — Plaintiff alleges that each saw Garcia "on a daily basis between April 28, 2022 and May 22,

2022," that each was aware that Garcia had a mental illness based on his placement in the C Pod Mental Health Unit, and that each ignored Garcia's deteriorating condition and failed to elevate his care, ultimately resulting in his death. (2d Am. Compl. ¶¶ 256, 270–73.) The Court previously analyzed the same set of allegations with regard to Defendant Finn and found that they sufficed to state a claim of deliberate indifference against her. *See supra* Section III.D.1. For the same reasons set forth above, the Court finds that Plaintiff's allegations sufficiently demonstrate that these Defendants "recklessly . . . failed to act to appropriately address the risk" posed by Garcia's condition, that they "should have known" that Garcia was suffering from malnutrition, and that their nonaction "posed an unjustifiably high risk of harm." *Short*, 87 F.4th at 611. Consequently, the Court finds that Plaintiff states a valid claim for deliberate indifference against these Defendants and will accordingly deny their Motion to Dismiss as to Count Seven.

As to Defendant Archer, ADC's Mental Health Supervisor, Plaintiff's allegations track those that he made against Defendant Sturm, which the Court previously found sufficient to state a claim for deliberate indifference. *See supra* Section III.D.2. Specifically, Plaintiff alleges that Archer was informed that Garcia was neither eating nor drinking, but took no action to address what she should have known was a serious medical situation, especially given her specific knowledge of Garcia's serious mental health issues from his family and his prior hospitalization. (2d Am. Compl. ¶¶ 52–53, 76.) Based on these allegations, and as with Defendant Sturm, the Court finds that Plaintiff validly claims that Defendant Archer failed to appropriately address the risk posed by Garcia's condition, of which she had actual knowledge and which she should have known posed an unjustifiably high risk of harm. *Short*, 87 F.4th at 611. For these reasons, and

as set forth in greater detail above, the Court denies Defendant Archer's Motion to Dismiss as to Count Seven.

With respect to Defendant Khan, Plaintiff alleges that he was responsible for conducting medical rounds and checks on Garcia's unit, actually performed medical checks on Garcia on both the day before his death and the day of his death, failed to elicit a verbal response from Garcia on both occasions, and took no action to obtain medical help for him.  (*Id.* ¶¶ 37, 83–84.) By that point, Garcia had lost approximately 30 pounds and was surrounded by food detritus in his cell.  (*Id.* ¶ 68; *id.* at 23, 25.)  Based on Defendant Khan's direct interactions with Garcia shortly before his death, the self-evident deterioration of Garcia's health and Khan's failure to act in the face of an unjustifiably high risk of serious harm to Garcia, the Court finds that Plaintiff plausibly states a claim of deliberate indifference against Khan.  The Court will therefore deny Defendant Khan's Motion to Dismiss as to Count Seven.

The Court reaches the same result for Defendant Azir, who Plaintiff alleges (1) was similarly responsible for conducting medical rounds and checks on Mr. Garcia's unit, (2) "had notice of and knew that Mr. Garcia was unable or unwilling to eat food and drink fluids" and to whom (3) Garcia's "malnutrition and dehydration were obvious and known."  (*Id.* ¶¶ 38, 66, 70.) Much like the Medical Defendants discussed above, the Court finds that these allegations sufficiently demonstrate that Azir "recklessly . . . failed to act to appropriately address the risk" posed by Garcia's condition, that he "should have known" that Garcia was suffering from malnutrition, and that his nonaction "posed an unjustifiably high risk of harm."  *Short*, 87 F.4th at 611.  Consequently, the Court finds that Plaintiff states a valid claim for deliberate indifference against Azir and will deny his Motion to Dismiss as to Count Seven.

As to Defendant Coots, a jail therapist at ADC, Plaintiff alleges that, approximately twelve days before Garcia's death, ADC officers informed Coots that Garcia was displaying "strange behavior" and not eating.  (*Id.* ¶ 74.)  Coots subsequently visited Garcia, whereupon she directed correctional officers to create a food log for him.  (*Id.* ¶ 75.)  She also communicated this information to her supervisors, Defendants Archer and Sturm, who proceeded to take no further action.  (*Id.*)  Critically, Plaintiff alleges that Coots took no further steps herself to escalate Garcia's level of care, including after it "became obvious that no action was taken" by anyone else at ADC.  (*Id.*)

The Court finds that, despite the actions Defendant Coots took twelve days before Garcia's death, Plaintiff's allegations suffice to state a claim for deliberate indifference against her, given the subsequent disregard for what was clearly a serious medical situation and her failure to further address it.  The Fourth Circuit's decision in *Short* proves instructive on this point.  There, the Court found that Plaintiff stated a valid claim for deliberate indifference against a Sergeant who ordered solitary confinement for an inmate with a risk of suicide, despite having consulted two nurses who took no further action in this regard.  The Fourth Circuit rejected the argument that the inaction of medical professionals shields a reporting party from liability, since "[h]olding otherwise would shield non-medical defendants from liability whenever a medical provider was at some point consulted."  *Short*, 87 F.4th at 614.  The court also cited its prior opinion in *Iko v. Shreve*, 535 F.3d 225 (4th Cir. 2008), where it found deliberate indifference on similar facts, because the detainee "received *no* medical treatment whatsoever," such that there "was *no* medical opinion to which the officers could have deferred." *Id.* at 242.

Here, while Defendant Coots may have sought to absolve herself of responsibility by assigning the food log and notifying senior health care providers, the lack of any action on their part renders any claim of reliance similarly unfruitful. In light of Coots' continued employment as a jail therapist at ADC throughout Garcia's remaining time at ADC, and in light of her disregard of Garcia's deteriorating condition in the face of collective inaction by other ADC employees, the Court finds that Coots' earlier actions in alerting others about Garcia's situation fail to defeat Plaintiff's claim of deliberate indifference against her. Consequently, the Court will deny Defendant Coots' Motion to Dismiss as to Count Seven.

The Court reaches a different result regarding Defendant Liagouris, another ADC jail therapist. Plaintiff alleges that Defendant Liagouris received information from Garcia's family concerning his serious mental health issues and failed to escalate his care despite possessing this information. (2d Am. Compl. ¶¶ 73, 75.) Yet, unlike Defendant Coots, Plaintiff does not allege any specific instances where Liagouris had direct interactions with Garcia or that she was even aware of his acute health situation at ADC. Liagouris is not alleged to have conducted rounds at C Pod, and beyond her receipt of information from Garcia's family, Plaintiff does not allege any facts suggesting that Liagouris had any reason to know anything at all about Garcia's then-current condition. The only remaining allegations to the contrary — that Liagouris, as a Medical Defendant, "knew that Mr. Garcia was unable or unwilling to eat food and drink fluids independently," (*Id.* ¶ 66), and the general allegations against all Medical Defendants contained under Count Seven (*Id.* ¶¶ 255–69, 276) — are too conclusory and unspecific to plausibly establish that she was even aware of, let alone deliberately indifferent to, Garcia's serious medical needs. Accordingly, the Court will grant Defendant Liagouris's Motion to Dismiss as to Count Seven.

The Court remains unpersuaded by Medical Defendants' arguments that they stand shielded from Plaintiff's constitutional claims by qualified immunity. As with other Defendants raising similar claims in this case, Medical Defendants' argument falls flat in the face of courts' longstanding recognition of prisoners' rights to provision of adequate food and medical attention, and courts' recognition that deliberate indifference to prisoners' serious medical needs violates their rights. *See supra* Sections III.D.1, 2.b; *see, e.g.*, *Gordon*, 971 F.2d at 1094 (describing right to medical attention as "clearly established"). In light of the "clearly established" nature of the rights that Defendants allegedly violated, and for the reasons set forth more fully in the Court's discussion *supra*, the Court rejects Medical Defendants' argument that qualified immunity shields them from Plaintiff's constitutional claims under § 1983. Plaintiff's claims against them may proceed accordingly.

**b.      Section 1983 Supervisory Liability (Count Five)**

Plaintiff asserts claims of § 1983 supervisory liability against three Medical Defendants: Defendants Archer (Mental Health Supervisor), Koko (Nursing Director) and Ochieng (Nursing Supervisor). As with his other supervisory liability claims, Plaintiff's allegations fail to establish a widespread failure to respond to the medical needs of inmates and detainees at ADC beyond Mr. Garcia's case, as Fourth Circuit law requires him to do. *See supra* Sections III.D.2.b, 4.b. His only allegations to that effect, which the Court previously recited, are conclusory in nature and lack specific facts and examples in support. Accordingly, and for the reasons more fully set forth *supra*, the Court will grant Defendants Archer, Koko and Ochieng's Motion to Dismiss with respect to Count Five.

c.      **Negligence and Gross Negligence (Counts One and Two)**

Concerning Plaintiff's tort claims against Medical Defendants, the Court must again contend with the fact that Plaintiff incorporated preceding and succeeding paragraphs into his gross negligence count (Count Two), but only preceding paragraphs into his ordinary negligence count (Count One).  (2d Am. Compl. ¶¶ 103, 110.)   As such, some critical facts that Plaintiff pleads as part of Count Seven against Defendants Amy Allen, Crawford, Koko, Mobley, Ochieng, Revard and Wright stand incorporated into Count Two, but not into Count One.

Since valid deliberate indifference claims necessarily state valid gross negligence claims under Fourth Circuit law, the Court finds that Plaintiff states valid claims for gross negligence under Count Two as to all Medical Defendants against whom Plaintiff also states valid deliberate indifference claims, which includes all Medical Defendants except Defendant Liagouris.  The same stands true for Plaintiff's ordinary negligence claims against Defendants Archer, Azir, Coots and Khan, whose deliberate indifference claims rest on facts that precede Count One in the Second Amended Complaint and therefore stand incorporated into that Count.

As to Defendants Amy Allen, Crawford, Koko, Mobley, Ochieng, Revard and Wright, the Court finds that, excluding the specific allegations pled under Count Seven (but not incorporated into Count One), Plaintiff presents insufficient allegations to state a valid claim of ordinary negligence against these Defendants.  Plaintiff's remaining allegations state that these Defendants worked in various capacities as care providers at ADC, (*id*. ¶¶ 32–39,) but unlike Defendants Khan and Azir, Plaintiff does not specify that they worked on Garcia's unit or had any direct interactions with him.  While Plaintiff alleges that these Defendants (as part of the larger group of Medical Defendants) "had notice of and knew that Mr. Garcia was unable or unwilling to eat food and drink fluids independently," (*id*. ¶¶ 66), that allegation on its own is too

conclusory and unspecific to establish that they acted unreasonably with regard to Garcia and his needs. As such, the Court cannot find that Plaintiff plausibly establishes duty, breach or causation for any of the above-listed Defendants within the portions of the Second Amended Complaint that stand incorporated into Count One. The Court will therefore dismiss Count One as to Defendants Amy Allen, Crawford, Koko, Mobley, Ochieng, Revard and Wright.

The Court will similarly grant Defendant Liagouris' motion to dismiss both Counts One and Two. As discussed in the context of Plaintiff's deliberate indifference claims against her, the allegations against Defendant Liagouris stand devoid of any specifics establishing that she interacted directly with Garcia or was even aware of his condition. As such, Plaintiff cannot establish duty, breach or causation as to this Defendant, dooming his ordinary and gross negligence claims at this stage.

Medical Defendants raise essentially the same arguments as Correctional Officer Defendants with respect to sovereign immunity. (ECF No. 78 at 21.) The Court finds no basis for a different outcome than the one flowing from its analysis of the arguments by Defendant Sturm and Correctional Officer Defendants. *See supra* Sections III.D.2.b., 3.b; *cf. Adams*, 243 F. Supp. 3d at 720 (finding that the choice to "let a pretrial detainee under one's care thirst and starve to death . . . does not require the exercise of much, if any, discretion or judgment"). Accordingly, the Court finds that Defendants Archer, Azir, Coots and Khan — the only Medical Defendants against whom Plaintiff states a valid claim for ordinary negligence — are not shielded by sovereign immunity.

*        *        *

In sum, the Court will grant Medical Defendants' Motion to Dismiss as to all counts against Defendant Liagouris. The Court will also dismiss Count One (negligence) as to

Defendants Amy Allen, Crawford, Koko, Mobley, Ochieng, Revard and Wright, and Count Five (supervisory liability) with regards to Defendants Koko, Archer and Ochieng.  All other claims against Medical Defendants shall proceed.

### 6.    The Jail Board Defendants' Motion to Dismiss

Defendants Jail Board, ADC and Hill face the following remaining claims:  negligence (Count One), gross negligence (Count Two) and a *Monell* claim (Count Four) against all three Defendants, as well as a supervisory liability claim (Count Five) against Defendant Hill, whom Plaintiff sues in both his individual and official capacities.  (2d Am. Compl. ¶ 17).  These Defendants assert various arguments in support of dismissal, including, as relevant here, that (1) ADC, the Jail Board and Hill (in his official capacity) lack the capacity to be sued; (2) Plaintiff has failed to state a § 1983 supervisory liability claim; and (3) Plaintiff fails to state any claim for relief under state law against any of these Defendants.  (ECF No. 80 at 5–8, 10–16, 18.)  For the reasons set forth below, the Court will grant Defendants Jail Board, ADC and Hill's Motion to Dismiss in its entirety.

### a.    Capacity to be Sued

The Jail Board, ADC and Hill argue that the provisions of Virginia law establishing jail boards and regional jails (such as ADC) fail to establish their authority to sue or be sued.  Under the Federal Rules of Civil Procedure, state law determines capacity to be sued.  Fed. R. Civ. P. 17(b).  As Defendants recount (and Plaintiff does not dispute), the ADC came into existence when Prince William County and the City of Manassas combined to establish a regional jail in accordance with Va. Code § 53.1-105.  (ECF No. 80 at 5–6.)  The Jail Board in turn was created pursuant to Va. Code § 53.1-106(A) to supervise and manage ADC; Defendant Hill serves as Chairman of that Board.  (*Id*. at 6.)  Critically, these Virginia statutes do not set forth a grant of

64

authority for either the ADC or the Jail Board to be sued.  Va. Code §§ 53.1-105, 53.1-106(B).

This Court's prior cases affirm such an understanding of Virginia jail boards' and jails' capacity

to be sued.  *See, e.g.*, *Harris v. N. Neck Reg'l Jail Bd. Auth.*, 2008 WL 4468080, at *2 (E.D. Va.

Oct. 1, 2008) ("There is no provision permitting these regional jail boards to sue and be sued in

its [sic] own name."); *McCoy v. Chesapeake Corr. Ctr.*, 788 F. Supp. 890, 894 (E.D. Va. 1992)

(finding that the Chesapeake City Jail lacks capacity to be sued under both § 1983 and state law).

As this Court recognized in *Harris*, "[w]here a state provides no authority to sue a jail,

dismissal is appropriate under Rule 17(b)."  2008 WL 4468080 at *2; *see also Davis v.

Portsmouth*, 579 F. Supp. 1205, 1210 (E.D. Va. 1983) (finding that, where no grant of authority

to be sued exists under state law, the entity at issue "is not a proper defendant").  Plaintiff argues

that this rule does not apply to *Monell* claims, but fails to point to any authority in support.

Given the absence of authority in the relevant Virginia statutes for these entities to be sued, the

Court must dismiss all of Plaintiff's claims against the Jail Board, ADC and Defendant Hill in

his official capacity.[26]

### b.    Section 1983 Claim Against Defendant Hill

Plaintiff's only remaining constitutional claim concerns Defendant Hill in his individual

capacity, against whom he alleges a claim for supervisory liability (Count Five).  This claim fails

for substantially the same reasons set forth by the Court regarding Defendant Meletis.  *See supra*

---

[26]    As Jail Board Defendants correctly contend, to the extent that Plaintiff asserts claims against Defendant Hill in his official capacity, these stand akin to "pleading an action against [the] entity of which [the] officer is an agent."  *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  Since the Jail Board lacks authority to be sued, Defendant Hill, in his official capacity as Chairman of the Jail Board, lacks the same.

Further, to the extent that the Second Amended Complaint asserts claims against Defendant Hill in his official capacity as Sheriff of Prince William County, these shall be dismissed on Eleventh Amendment immunity grounds, as Plaintiff concedes in his reply brief. (ECF No. 88 at 11 n.2.)

Section III.D.4.b.  Plaintiff's allegations with respect to supervisory liability prove conclusory and stand devoid of any facts beyond the incidents surrounding Garcia.  As such, they fail to establish the widespread pattern of misbehavior required to render a claim of supervisory liability valid.  *Wiggins*, 222 F. Supp. 3d at 502.  Accordingly, Plaintiff fails to state a claim against Defendant Hill in his individual capacity under Count Five; the Court will therefore dismiss this claim.

### c.   Tort Claims against Defendant Hill

Plaintiff also asserts claims of negligence and gross negligence against Defendant Hill in his individual capacity under Counts One and Two.  The Court finds Plaintiff's allegations insufficient to support these claims.  Throughout the Second Amended Complaint, Plaintiff fails to allege any facts demonstrating Hill's involvement with any of the circumstances surrounding Garcia's death.  Beyond collective and conclusory claims that Hill, along with all other Defendants, owed Garcia various duties and acted negligently towards him, Plaintiff provides no specifics supporting a finding that Defendant Hill was even aware of Garcia's existence, let alone his detention or his medical condition.  Without such facts, Plaintiff fails to establish a basis for any finding of breach concerning Hill's alleged duties towards Garcia.  Plaintiff therefore fails to state a plausible tort claim for negligence or gross negligence against Defendant Hill in his individual capacity; the Court will dismiss these claims against him.[27]

\*     \*     \*

---

[27]     While the Court need not reach this issue, Defendant Hill also stands entitled to sovereign immunity protections as to Plaintiff's negligence claim.  Hill's role in supervising and managing the jail, as Chairman of the Jail Board, stands replete with the kinds of discretion and judgment that sovereign immunity seeks to protect.  *See Lloyd v. Morgan*, 2015 WL 1288346, at \*11 (E.D. Va. Mar. 20, 2015) (holding that sheriff's role in overseeing jail was "clearly discretionary").

As set forth above, the Court will grant Defendants Jail Board, ADC and Hill's Motion to Dismiss in full. Plaintiff's claims against these Defendants will be dismissed from this action.

## IV.    CONCLUSION

For the reasons set forth above, the Court will GRANT IN PART and DENY IN PART Plaintiff's motions seeking leave to file a sur-reply (ECF No. 98, 100). The Court will GRANT Plaintiff's first motion (ECF No. 98) and will DIRECT the Clerk to docket the proposed sur-reply (ECF No. 98-2); the Court will not, however, consider Plaintiff's withdrawn arguments on state sovereign immunity. The Court will GRANT Plaintiff's second sur-reply motion (ECF No. 100) to the limited extent that it seeks the Court's consideration of its responses to newly raised arguments and DENY Plaintiff's motion to convert Defendant Finn's Motion to Dismiss into a motion for summary judgment. The Court will DIRECT the Clerk to docket the proposed sur-reply (ECF No. 100-2).

As to Defendants' Motions to Dismiss, the Court will GRANT IN PART and DENY IN PART the various Motions (ECF Nos. 50, 71, 73, 75, 77, 79). Specifically, the Court will:

(a)    DISMISS WITH PREJUDICE Counts Three and Eight against all Defendants as improperly pled. The Court will DIRECT Plaintiff to replead Counts One and Two in accordance with the relevant Virginia statutory provisions. *See* Va. Code §§ 8.01-50 *et seq.* and 8.01-25 *et seq.*;

(b)    GRANT Defendant Finn's Motion as to Count One and DISMISS WITHOUT PREJUDICE Count One as to Defendant Finn;

(c)    DENY Defendant Finn's Motion as to Counts Two and Seven;

(d)    GRANT Defendant RCHC's Motion as to Count Seven and DISMISS WITH PREJUDICE Count Seven as to Defendant RCHC;

(e) DENY Defendant RCHC's Motion as to Counts One and Two;

(f) GRANT Defendant Sturm's Motion as to Count Five and DISMISS WITH PREJUDICE Count Five as to Defendant Sturm;

(g) DENY Defendant Sturm's Motion as to Counts One, Two and Seven;

(h) DENY Defendants Hendricks, James, Lindsey, McDonald, Ralls and Williams' Motion as to all remaining Counts;

(i) GRANT Defendant Deshields' Motion as to Count Five and DISMISS WITH PREJUDICE Count Five as to Defendant Deshields;

(j) DENY Defendant Deshields' Motion as to Counts One, Two and Six;

(k) GRANT Defendants Tracy Allen, Daniels and Thompson's Motion as to Count One and DISMISS WITHOUT PREJUDICE Count One as to these Defendants;

(l) DENY Defendants Tracy Allen, Daniels and Thompson's Motion as to Counts Two and Six;

(m) GRANT Defendant Meletis' Motion and DISMISS WITH PREJUDICE Counts One, Two, Four and Five as to Defendant Meletis;

(n) GRANT Defendant Liagouris' Motion and DISMISS WITH PREJUDICE Counts One, Two, and Seven as to Defendant Liagouris;

(o) GRANT Defendants Koko and Ochieng's Motion as to Counts One and Five, DISMISS WITHOUT PREJUDICE Count One, and DISMISS WITH PREJUDICE Count Five as to these Defendants;

(p) DENY Defendants Koko and Ochieng's Motion as to Counts Two and Seven;

(q) GRANT Defendant Archer's Motion as to Count Five, and DISMISS WITH PREJUDICE Count Five as to Defendant Archer;

(r)      DENY Defendant Archer's Motion as to Counts One, Two and Seven;

(s)      GRANT Defendants Amy Allen, Crawford, Mobley, Revard and Wright's Motion as to Count One and DISMISS WITHOUT PREJUDICE Count One as to these Defendants;

(t)      DENY Defendants Amy Allen, Crawford, Mobley, Revard and Wright's Motion as to Counts Two and Seven;

(u)      DENY Defendants Azir, Coots and Khan's Motion as to all remaining counts;

(v)      GRANT Defendants ADC, Jail Board and Hill's Motion and DISMISS WITH PREJUDICE Counts One, Two, Four and Five as to these Defendants.

The case shall proceed on all remaining counts against all applicable Defendants.

The Court will further GRANT Plaintiff leave to amend the Second Amended Complaint within FOURTEEN (14) DAYS of the entry of this Memorandum Opinion and Order. The Court DIRECTS Plaintiff to remedy the pleading issues concerning Counts One and Two to conform with Virginia law. Any amended filing must comply with Federal Rules of Civil Procedure 8(a) and 10(b) and must exclude all claims that the Court orders dismissed with prejudice against the appropriate parties. Failure to follow these requirements will result in dismissal of this action by the Court.

As to those claims dismissed with prejudice, the Court finds that these claims suffer from fundamental deficiencies and that any further amendment of these claims would be futile. Despite the benefit of early discovery and a prior round of motions to dismiss by Defendants, Plaintiff was unable to remedy these deficiencies and plead adequate facts. Consequently, in light of the futility of further amendment, the Court will not permit the Plaintiff to amend these

claims again. *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 630 (4th Cir. 2008).

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all

counsel of record.

_____/s/_____

David J. Novak

United States District Judge

Richmond, Virginia
Date:  March 19, 2025